**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
KEVIN LONG and LUDVIC PRESTO,                          :
                                                       :
                          Plaintiffs,                  :
                                                       :
            v.                                         :          05 Civ. 0639 (GEL)
                                                       :
MARUBENI AMERICA CORPORATION;                          :
KAZUHIKO SAKAMOTO in his official and                  :
individual capacities; MASAMI SAITO in his             :
official and individual capacities; JOE VAN            :
DORN in his official and individual capacities;        :
and SHIGEMASA SONOBE in his official and               :
individual capacities,                                 :
                                                       :
                          Defendants.                  :
-------------------------------------------------------------------X


---

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS TO STRIKE

---


**THOMPSON WIGDOR & GILLY LLP**

Attorneys for Plaintiffs
350 Fifth Avenue, Suite 5720
New York, New York 10118
Telephone: (212) 239-9292
Facsimile:  (212) 239-9001

## TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS………………………………………………………….i

TABLE OF AUTHORITIES……………………………………………………..iii

PRELIMINARY STATEMENT………………………………………………….1

STATEMENT OF FACTS……………………………………………………...3

      Plaintiffs' Employment as Senior Executives of MAC…………………………..3

      Plaintiffs Opposed Pervasive Discrimination and Other Unlawful
      Conduct at MAC……………………………………………………………….4

      Defendants' Retaliation Against Plaintiffs…...…………………………………...8

ARGUMENT……………………………………………………………………11

I.      STANDARD OF REVIEW FOR A MOTION TO DISMISS…………………..11

II.    PLAINTIFFS ALLEGE VALID SECTION 1981 CLAIMS AS A
       MATTER OF FACT AND AS A MATTER OF LAW…………………………12

      A.    Plaintiffs' Section 1981 Claims Are Based On The Fact That
           They Have Been Discriminated Against Because They Are
           Non-Asian Employees……………………………………………………...14

      B.    Defendants' Section 1981 Dismissal Argument Is Not Warranted
           By Existing Law……………………………………………………………15

      C.    Defendants' Selective Citation Of Existing Law Cannot Conceal
           The Motions' Lack Of Merit……………………………………………..18

III.   PLAINTIFFS' SECTION 1981 RETALIATION CLAIMS ARE VALID……...20

IV.   DEFENDANTS' ARGUMENT AGAINST THE EXERCISE OF
       SUPPLEMENTAL JURISDICTION IS FUTILE……………………………21

V.    THE COMPLAINT STATES A VALID CLAIM FOR DEFAMATION………21

      A.    Section 74 Of The New York Civil Rights Law Provides No
           Basis For Dismissal…………………………………………………...22

      B.    The E-mail Is Not A Statement Of Opinion……………………………23

C.     The E-mail Is Not Subject To A Qualified Privilege..........................25

D.     Plaintiffs' Defamation Claims Satisfy Fed. R. Civ. P. 8 Pleading
       Standards.........................................................................28

VI.    PLAINTIFFS HAVE ASSERTED VALID DISCRIMINATION,
       RETALIATION AND AIDING AND ABETTING CLAIMS AGAINST
       INDIVIDUAL DEFENDANTS SONOBE AND VAN DORN.....................30

VII.   DEFENDANTS' MOTIONS TO STRIKE SHOULD BE DENIED IN
       THEIR ENTIRETY.................................................................32

A.     Standard Of Review For A Motion To Strike................................32

B.     All Of Plaintiffs' Allegations Are Material To Their Claims And
       Capable Of Being Proved With Admissible Evidence......................33

CONCLUSION.............................................................................36

## TABLE OF AUTHORITIES

**CASES**                                                                       **PAGE**

*Adames v. Mitsubishi Bank, Ltd.,*
    751 F. Supp. 1548 (E.D.N.Y. 1990)......................................................17

*Albert v. Carovano,*
    851 F.2d 561 (2d Cir. 1988)...........................................................12

*Alicea Rosado v. Garcia Santiago,*
    562 F.2d 114 (1st Cir. 1977)..........................................................34

*Avigliano v. Sumitomo Shoji Am., Inc.,*
    473 F. Supp. 506 (S.D.N.Y. 1979)....................................................19

*Bullard v. Omi Georgia, Inc.,*
    640 F.2d 632 (5th Cir. 1981)...........................................................18

*Carone v. Venator Group, Inc.,*
    11 A.D.3d 399 (1st Dept 2004).......................................................28

*Conley v. Gibson,*
    355 U.S. 41 (1957)...............................................................11, 30

*Cooper v. Parsky,*
    140 F.3d 433 (2d Cir. 1998)..........................................................11

*Crespo v. NYC Transit Auth.,*
    01-CV-0671, 2002 WL 398805 (E.D.N.Y. Jan. 7, 2002)..........................33

*Elmore v. Shell Oil Co.,*
    733 F. Supp. 544 (E.D.N.Y. 1988)...................................................25

*Enriquez v. Honeywell, Inc.,*
    431 F. Supp. 901 (W.D. Okla. 1977).................................................17

*Esterquest v. Booz-Allen & Hamilton, Inc.,*
    97 Civ. 6957, 2002 WL 237846 (S.D.N.Y. Feb. 19, 2002)......................35

*Ganthier v. North Shore-Long Island Jewish Health Sys.,*
    298 F. Supp. 2d. 342 (E.D.N.Y. 2004)..............................................13

*Ghose v. Century 21, Inc.,*
    No. 00-9165, 2001 WL 682369 (2d Cir. Jun. 14, 2001)..........................12

*Gleason v. Chain Serv. Rest.,*
    300 F. Supp. 1241 (S.D.N.Y. 1969)..............................................33

*Grandon v. Merrill Lynch & Co.,*
    147 F.3d 184 (2d Cir. 1998)....................................................11

*Hofmann v. District Council 37,*
    99 Civ. 8636, 2004 WL 1936343 (S.D.N.Y. Aug. 31, 2004)........................25

*Hollander v. Cayton,*
    145 A.D.2d 605 (2nd Dept 1988)................................................27

*Kalika v. Stern,*
    911 F. Supp. 594 (E.D.N.Y. 1995)..............................................29

*Kelly v. Schmidberger,*
    806 F.2d 44 (2d Cir. 1986)....................................................29

*Korry v. Int'l Tel. & Tel. Corp.,*
    444 F. Supp. 193 (S.D.N.Y. 1978)..............................................29

*Liberman v. Gelstein,*
    590 N.Y.S.2d 857 (1992).......................................................25

*Lipsky v. Commonwealth United Corp.,*
    551 F.2d 887 (2d Cir. 1976)...................................................33

*Mandel v. Champion Int'l Corp.,*
    361 F. Supp. 2d 320 (S.D.N.Y. 2005)...........................................35

*Odom v. Columbia Univ.*
    906 F. Supp. 188 (S.D.N.Y. 1995)..............................................28

*Ongsiako v. City of N.Y.,*
    199 F. Supp. 2d 180 (S.D.N.Y. 2002)...........................................35

*Pena v. Brattleboro Retreat,*
    702 F.2d 322 (2d Cir. 1983)...................................................34

*Porto v. Canon, USA Inc.,*
    No. 81-C-1305, 1981 WL 381 (N.D. Ill. Sept. 9, 1981)..........................20

*Pub. Relations Soc'y of Am. v. Road Runner High Speed Online,*
    No. 116210/04, 2005 WL 1330514 (N.Y.Sup. May 27, 2005)........................24

*Reeves v. Cont'l Equities Corp. of Am.,*
    767 F. Supp. 469 (S.D.N.Y. 1991)……………………………………………29

*Ricciuti v. N.Y.C. Transit Auth.,*
    941 F.2d 119 (2d Cir. 1991)…………………………………………………...30

*Rigodon v. Deutsche Bank Sec., Inc.,*
    04 Civ. 2548, 2004 WL 2471859 (S.D.N.Y. Nov. 1, 2004)…………………16, 17

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)………………………………………………………….....11

*Shapiro v. Health Ins. Plan of Greater N.Y.,*
    7 N.Y.2d 56 (1959)……………………………………………………………25

*Smith v. AVSC Int'l, Inc.,*
    148 F. Supp. 2d 302 (S.D.N.Y. 2001)……………………………………….....32

*Spiess v. C. Itoh & Co.,*
    408 F. Supp. 916 (S.D. Tex. 1976)……………………………………….17, 18

*St. Francis College v. Al-Khazraji,*
    481 U.S. 604 (1987)……………………………………………...16, 18, 19

*Steinhilber v. Alphonse,*
    68 N.Y.2d 283 (1986)…...……………………………………………….23, 24

*Sunshine Cellular v. Vanguard Cellular Sys., Inc.,*
    810 F. Supp. 486 (S.D.N.Y. 1992)……………………………………………32

*Williams v. Williams,*
    23 N.Y.2d 592 (1969)…………………………………………………………22

*Young v. Southwestern Savings & Loan Ass'n,*
    509 F.2d 140 (5th Cir. 1975)…………………………………………………34

*Zinaman v. USTS New York, Inc.,*
    798 F. Supp. 128 (S.D.N.Y. 1992)……………………………………….32, 33

**RULES**

CPLR 3016 (a)……………………………………………………………….....28

Fed. R. Civ. P. 8………………………………………………………....2, 28, 30

Fed. R. Civ. P. 11…………………………………………………………….....16

Fed. R. Civ. P. 12…………………………………………………………*passim*

**STATUTES**

28 U.S.C. § 1367 (c)(3)…………………………………………………………21

42 U.S.C. § 1981…………………………………………………………1, 30

N.Y. Admin. Code §§ 8-101…………………………………………1, 14, 21, 30

N.Y. Civ. Rights Law § 74…………………………………………………22

N.Y. Exec. L. § 290…………………………………………...1, 14, 21, 30

**OTHER**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
      Civil 2d § 1382, 697-700……………………………………………...33

Plaintiffs Kevin Long ("Mr. Long") and Ludvic Presto ("Mr. Presto") (together, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to the separate Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and the Motions to Strike pursuant to Fed. R. Civ. P. 12(f), filed by Defendant Marubeni America Corporation ("MAC" or the "Company") and by Defendants Kazuhiko Sakamoto ("Sakamoto"), Masami Saito ("Saito"), Joe Van Dorn ("Van Dorn") and Shigemasa Sonobe's ("Sonobe") (collectively, the "Individual Defendants").[1]

## PRELIMINARY STATEMENT

As explained below, the Court should deny Defendants' motions in their entirety. Contrary to Defendants' arguments, Plaintiffs' Amended Complaint ("Complaint" or "Compl.") more than sufficiently states a claim for race-based discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981") and for defamation. The Complaint is replete with numerous specific allegations of discrimination and retaliation for complaining about race-based discrimination that Plaintiffs, who are both Caucasian, have been subjected to at MAC because they are not Asian. These allegations state a claim for race discrimination and retaliation under Section 1981. The Complaint also contains separate claims for not only race, but also national origin discrimination and retaliation under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") not only because Plaintiffs are not Asian, but also because they are not of Japanese origin. Throughout the Complaint, therefore, Plaintiffs allege discriminatory acts inflicted upon them (and other employees) because they are non-Asian/non-Japanese to state independent claims under these distinct statutes. Defendants' intellectually dishonest attempt to ignore the distinction between claims based upon Plaintiffs'

---

[1]     Rather than submitting four separate memoranda in opposition to Defendants' motions, Plaintiffs address all of the motions in one consolidated opposition memorandum for the Court's convenience.

non-Asian (or Caucasian) race and claims based upon Plaintiffs' non-Japanese (or American and Canadian) national origin should be rejected.

Defendants' remaining arguments for dismissal also fail. The Complaint states a valid claim for defamation. Defendants' varying arguments that the defamatory e-mail quoted in the Complaint is protected by Section 74 of the New York Civil Rights Law, is a statement of opinion, and is subject to a qualified privilege are all baseless. Moreover, Plaintiffs' defamation claim is sufficiently specific to satisfy the pleading requirements under Fed. R. Civ. P. 8. Additionally, the Complaint alleges that Defendant Sonobe participated directly in the unlawful discrimination and retaliation about which Plaintiffs complained, and that Defendant Van Dorn fostered a discriminatory environment at MAC that Plaintiffs and other non-Asian/non-Japanese employees had to endure and retaliated against Plaintiffs after they complained about and opposed these discriminatory conditions. Thus, Plaintiffs' claims of discrimination, retaliation and aiding and abetting against Defendants Sonobe and Van Dorn do not merit dismissal.

Finally, Defendants' contention that certain allegations contained in the Complaint are scandalous, prejudicial or immaterial, and thus should be stricken, is totally without merit. These provable allegations are central to Plaintiffs' case. Indeed, they directly support Plaintiffs' cause of action for a declaratory judgment that Defendant MAC's refusal to address accounting violations and other financial transgression, violations of the United States employment and immigration laws, and other misconduct, as well as its subsequent unlawful discriminatory and retaliatory conduct against Plaintiffs in response to their efforts to eradicate this corporate malfeasance constitute a constructive discharge and/or "good cause" for them to terminate their employment, thereby entitling them to receive contractual severance payments.

As more fully explained below, Defendants' motions to dismiss and motions to strike should be denied.

## STATEMENT OF FACTS

### Plaintiffs' Employment as Senior Executives of MAC

Defendant MAC, a wholly-owned subsidiary of Marubeni Corporation of Japan, is a New York corporation with its principal place of business located here in New York City. (Compl. ¶ 16). MAC is a general trading company that acts as an intermediary in the area of industrial, agricultural and consumer goods. (*Id.*) Mr. Long and Mr. Presto have given MAC many committed and valuable years of employment. More specifically, Mr. Long began working for MAC in 2001 as the Director of Human Resources. As a result of his outstanding work, he became Senior Vice President and General Manager of Human Resources. (*Id.* ¶¶ 25-28). Similarly, Mr. Presto performed outstanding work since joining MAC in 1996 as a Manager of Internal Audit. He rose to the level of Senior Vice President and General Manager of the Internal Audit Team due to his excellent work. (*Id.* ¶¶ 29-32).

In or about January 2002, acting on behalf of MAC, Defendant Van Dorn gave Plaintiffs "secure life-time agreements" that guaranteed their "life long employment unless [they] were terminated for cause" and that included severance in the amounts of $4,875,000 for Mr. Long and $4,625,000 for Mr. Presto. ("Severance Agreements"). (*Id.* ¶¶ 33-34, 36-38). The Severance Agreements were given to Plaintiffs in recognition for "their significant and ongoing contributions to MAC" and "to compensate [them] for Marubeni's shortfall regarding options, stock, and other longer term incentives commonly granted senior executives." (*Id.* ¶ 35). Among other benefits, the agreements offered Plaintiffs generous severance packages, pensions for all future services and full medical coverage to age 65. (*Id.* ¶¶ 33-40).

3

Defendant Saito confirmed, both verbally and in writing, the validity of Plaintiffs'
Severance Agreements. He stated in a written memorandum to Plaintiffs dated April 22, 2004
that, "[t]he purpose of this memo is to confirm [to] you the contents of contract letter dated
January 18, 2002; from our Mr. Joe Van Dorn, former EVP who is retired, and to you, our
current SVP's Mr. Long and Mr. Presto. Please don't worry [about] anything, MAC is doing
well. Please understand you both have life-time Japanese like employment guarantee[s] as
outlined except [their] value probably [has] increase[d] given current cash compensation and
promotions." (*Id.* ¶¶ 39-40).

**Plaintiffs Opposed Pervasive Discrimination and Other Unlawful Conduct at MAC**

Despite their high-ranking positions and enormous contributions to MAC, Plaintiffs have
been subjected to unlawful discrimination because they are non-Asian/non-Japanese employees
of MAC. For example, Plaintiffs received significantly lower compensation, including bonuses,
than the Asian/Japanese rotational executives at MAC who had less experience and were less
qualified than Plaintiffs. (*Id.* ¶ 42). Moreover, despite Plaintiffs' more senior titles and superior
qualifications, their Asian/Japanese "counterparts," who are technically their subordinates,
retained greater power and responsibilities within the organization. (*Id.* ¶ 43).

Plaintiffs have also witnessed their non-Asian/non-Japanese co-workers suffer from the
very same pattern and practice of disparate treatment and have opposed such unlawful conduct
from their positions within the Company. For example, non-Asian/non-Japanese employees,
particularly females, had virtually no opportunity to advance at MAC beyond a certain level of
management. (*Id.* ¶ 47). Additionally, when MAC periodically reduced its staff, an effort was
made to terminate non-Asian/non-Japanese employees first, regardless of their qualifications,
performance or seniority. (*Id.* ¶ 58).

In addition to the disparate treatment of non-Asian/non-Japanese employees in their terms and conditions of employment, Plaintiffs also witnessed MAC senior executives routinely use derogatory slurs to describe African-American, Hispanic and Jewish employees and opposed such unlawful conduct. (*Id.* ¶ 61). For example, a senior Asian/Japanese executive referred to an African-American employee as "monkey man," an offensive term used to denigrate that employee on the basis of his race. (*Id.* ¶ 62). Another senior Asian/Japanese executive commented that "[t]his is a not a Jewish company. This is a Japanese company." (*Id.* ¶ 64).

MAC executives not only used derogatory language against minority employees, but also unlawfully discriminated against older and pregnant MAC employees as well. For example, a senior Asian/Japanese executive at MAC terminated a Caucasian/American employee because he was "too old and too overpaid." (*Id.* ¶ 66). Additionally, a senior Asian/Japanese executive sought the termination of a pregnant, Caucasian/American employee because he was "worr[ied] about her unstable situation after the delivery" and believed that she would return from her pregnancy-leave and not work as hard as she did before the birth of her child." (*Id.* ¶ 67).

Sadly, Defendant Van Dorn, the senior executive at MAC in charge of implementing and enforcing MAC's Equal Employment Opportunity and anti-discrimination policies, also unlawfully discriminated against non-Asian/non-Japanese employees. (*Id.* ¶¶ 70-79). For example, Defendant Van Dorn outright discouraged the hiring of minorities. In fact, when Mr. Presto sought to make an offer of employment to an African-American female applicant, Defendant Van Dorn told him directly that, "[w]e cannot hire a Black person." (*Id.* ¶ 79). In addition to discriminating against Black applicants, Defendant Van Dorn also participated in MAC's culture of using discriminatory language in describing many of MAC's female, African-American, Hispanic and Jewish employees. (*Id.* ¶¶ 71-79).

This hostile work environment and disparate treatment of non-Asian/non-Japanese employees has been well-documented externally and internally. Externally, ACRC, a human resources consultant hired by MAC, found that a "very destructive and racially charged environment" exists at MAC, and that its officials have no desire to correct it. (*Id.* ¶ 51). ACRC also found that the level of "discrimination against [non-Asian/non-Japanese] [ ] could become costly to MAC" and that the Company was a "ticking time bomb." (*Id.* ¶ 50). When MAC refused to act in response to the recommendations in the report, ACRC terminated its consulting relationship with MAC. (*Id.* ¶ 51).

Internally, Plaintiffs Long and Presto uncovered serious and repeated violations of employment laws, accounting fraud and other financial malfeasance. They repeatedly attempted to eradicate these problems by complaining to their supervisors about the unlawful discrimination and corporate wrongdoing. For example, in October 2003, Mr. Presto documented serious financial accounting fraud by Daisuke Hashimoto, who was the CEO of Fremont Forest Group Corporation, a subsidiary of MAC. (*Id.* ¶ 83). When Mr. Presto submitted a report to Defendant Saito, MAC's Chief Financial Officer and Administrative Officer, regarding the fraud he had uncovered, Defendant Saito crossed Defendant Sakamoto's name off of the report, apparently in an attempt to keep the President and CEO of MAC from learning about this information. (*Id.* ¶ 84). Mr. Presto brought another report regarding Mr. Hashimoto's fraudulent activities to Defendant Saito's attention again later in May 2004, but was told "not to waste any more time on this." (*Id.* ¶ 85). Despite evidence of his fraud, Mr. Hashimoto was never disciplined, but rather was merely transferred to another position with the Marubeni Corporation in Japan (*Id.* ¶ 88).

Plaintiffs also found fraudulent activity at other MAC subsidiaries, including Carlisle Leasing International and MAC Trailer Leasing d/b/a PLM Trailer Leasing. (*Id.* ¶ 101). When they brought these issues to the attention of management, they were told, "[e]xecutive [m]anagement already knows, and please back off." (*Id.* ¶ 101).

In 2004, with top management's approval, Plaintiffs conducted a surprise audit of MAC offices in California, Florida and New York. (*Id.* ¶ 103). Those audits revealed significant violations of United States employment laws and immigration laws, including falsification of H1-B and other Visa applications. (*Id.* ¶ 104). Almost a year after delivering a report of their findings to Defendants Sakamoto, Saito and Sonobe, nothing was done to correct those violations. (*Id.* ¶106). Out of their frustration with the refusal of MAC executives to take action and their obligation to MAC's employees and shareholders, Mr. Long issued an immigration alert to all MAC subsidiaries to urge them to take compliance seriously. (*Id.* ¶ 106).

After repeated attempts to address MAC's discriminatory and other unlawful practices with their immediate superiors, Plaintiffs Long and Presto decided to go directly to Defendant Sakamoto, MAC's President and CEO, to discuss these matters. Defendant Sakamoto, however, refused to take remedial action. He simply reminded Plaintiffs that there are stark differences between how Defendants treat Asian/Japanese and non-Asian/non-Japanese staff. (*Id.* ¶ 88).

On July 12, 2004, in a further attempt to protect MAC employees and shareholders, Plaintiffs jointly sent a letter to Defendant Sakamoto detailing "long standing and ongoing violations of the law" at MAC. (*Id.* ¶ 108). The letter offered several initiatives that should be taken to correct the fraudulent employment and accounting practices at MAC. After meeting with Defendant Sakamoto regarding the issues raised in the letter, he promised to set up a confidential committee to study the recommended initiatives. (*Id.* ¶ 108).

Approximately one month later, on August 2, 2004, Plaintiffs met with Defendant Saito about the discrimination and other misconduct at MAC. (*Id.* ¶ 112). Defendant Saito admitted nothing had been done to address the issues raised in the July 12 letter to Defendant Sakamoto. (*Id.*. ¶ 112). Defendant Saito also signed a document admitting to this fact. (*Id.* ¶ 112).

Two weeks later, Plaintiffs had another meeting with Defendant Saito and other MAC executives, where they again discussed the discrimination and other unlawful activities at MAC. (*Id.* ¶ 114). MAC executives again admitted they had taken no action to correct any of the serious issues, and signed a document to that effect. (*Id.* ¶ 114).

On August 30, 2004, Plaintiffs wrote Defendant Sakamoto another letter to express their growing frustration with MAC executives' refusal to correct the discrimination, fraud and other misconduct. (*Id.* ¶ 115). Defendant Sakamoto, however, still took no remedial action. Almost two months later, on October 21, 2004, Plaintiffs met personally with Defendant Sakamoto for a final appeal. (*Id.* ¶ 117). Defendant Sakamoto again took no remedial action and signed an admission to that effect. (*Id.* ¶ 117).[2]

## Defendants' Retaliation Against Plaintiffs

Rather than correct the problems brought to their attention by Plaintiffs, MAC embarked on a campaign of retaliation against Plaintiffs for their complaints about the discrimination and fraudulent activities at the Company. (*Id.* ¶ 122). As part of that retaliation, Plaintiffs were excluded from key executive meetings and their Japanese subordinates replaced Plaintiffs as *de facto* General Mangers of the Internal Audit and Human Resources Departments, all without notice to Plaintiffs. (*Id.* ¶ 123). For example, Mr. Presto lost responsibility for budgeting for his

---

[2]    Plaintiffs sought these signed admissions primarily to protect themselves from being charged with complicity in the Company's employment, immigration and accounting violations, and to document the serious problems at MAC and MAC executives' failure to act to correct them despite Plaintiffs' efforts. (Compl. ¶ 113).

department, while Mr. Long was excluded from several important senior-level meetings relating to the Human Resources Department. (*Id.* ¶ 123).

After their internal efforts to get MAC to end its pattern and practice of unlawful discrimination and other corporate wrongdoing had repeatedly failed, Plaintiffs retained counsel to address on their behalf the many issues they had raised. On November 10, 2004, Plaintiffs' counsel sent Defendant Sakamoto a letter detailing the retaliatory treatment Plaintiffs had received in response to their complaints of discrimination, employment law violations and accounting fraud. (*Id.* ¶ 125). Defendants responded to the letter by increasing their acts of retaliation against Plaintiffs.

For example, on November 24, 2004, based upon the retaliatory denial of the validity of Plaintiffs' Severance Agreements by Defendant Van Dorn, Defendants (through their longtime outside counsel, Proskauer Rose LLP ("Proskauer")), threatened to go to the FBI to commence a federal criminal investigation on trumped up charges that Plaintiffs conspired to extort millions of dollars from MAC through allegedly fraudulent Severance Agreements. (*Id.* ¶ 127). Proskauer attorneys, on behalf of Defendants, repeated this threat on several occasions.[3]

Additionally, on December 7, 2004, Defendants placed Plaintiffs on administrative leave, without cause, and prohibited them from entering MAC's premises. (*Id.* ¶ 129). While Plaintiffs were on administrative leave, the retaliation and harassment committed against them continued. For example, on January 5, 2004, Plaintiffs were threatened with immediate termination if they did not appear, on less than 24 hours' notice, at Proskauer to be interrogated by lawyers as part of a purported investigation into the validity of their Severance Agreements. (*Id.* ¶ 130).

---

[3]     To date, it appears that neither MAC nor its outside counsel has made any contact with the FBI, the U.S. Attorney's Office, the Manhattan District Attorney's Office or any law enforcement official regarding Plaintiffs' alleged extortion conspiracy, which further shows the retaliatory nature of such threats.

Finally, on January 25, 2005, Defendant Sonobe, the Chief Operating Officer at MAC, distributed an e-mail throughout the Company to all MAC employees entitled, "The Lawsuit Initiated by Kevin Long and Ludvic Presto Against the Company." (*Id.* ¶ 132). This e-mail defamed Plaintiffs by falsely and maliciously stating:

> "We believe that the two individuals have advanced their allegations as part of an effort to collect an unbelievably large amount of money of more than $4.5 million each, by way of severance agreements to which they are absolutely not entitled. They claim to rely on documents allegedly signed by executives of the Company who have totally denied ever signing or even seeing the documents in question. The two individuals have refused to make the original of these available for examination by a handwriting expert; and a preliminary investigation conducted by the Company has uncovered substantial evidence that the alleged severance letters are not genuine. When the Company made it clear that it would not pay the outrageous amounts of money demanded, the two individuals filed the litigation, claiming that they had been acting only for the purpose of improving the company."

(*Id.* ¶ 132). The e-mail falsely and maliciously accused Plaintiffs of engaging in criminal conduct and was designed to smear them in the eyes of their colleagues and co-workers. (*Id.* ¶ 132). More specifically, the last sentence of the e-mail, falsely and maliciously accused Plaintiffs of filing their lawsuit against MAC only after demanding large sums of money and MAC refused. (*Id.* ¶ 132).

To date, and upon information and belief, Defendants have done nothing to cure the discrimination, employment law violations and accounting fraud at MAC, while they continue to defame and retaliate against Plaintiffs. Further, Plaintiffs remain on administrative leave without cause and in violation of their Severance Agreements. Because Defendants' motions simply ignore these detailed allegations and rely upon flawed legal arguments, the Court should deny the motions in their entirety.

**ARGUMENT**

**I. STANDARD OF REVIEW FOR A MOTION TO DISMISS**

"Dismissal of a complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted is not warranted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support his claim which would entitle him to relief." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir. 1998) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46) (1957).). On a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, the Court is required to accept the material facts alleged in the complaint as true and construe all reasonable inferences in the nonmoving party's favor. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir. 1998).[4]

Moreover, the Supreme Court has held that "[w]hen a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

Here, despite Defendants' unfounded arguments to the contrary, the Complaint plainly and adequately states a claim for each and every cause of action alleged. Accordingly, Defendants' motions to dismiss should be rejected. (*See* Compl. ¶¶ 41-60). In light of Plaintiffs' many allegations of race-based discrimination and retaliation under Section 1981, it is clear that the Complaint is more than sufficient to survive Defendants' motions to dismiss pursuant to Fed.

---

[4]      Defendants also move for dismissal pursuant to Fed. R. Civ. P. 12(b)(1). The jurisdictional basis for Defendants' motions, however, necessarily depends upon Defendants prevailing on their Rule 12(b)(6) argument for dismissal of Plaintiffs' Section 1981 claims. As such, it is not necessary to address the Rule 12(b)(1) aspect of the motions separately, other than to note that it too fails along with Defendants' Rule 12(b)(6) argument for dismissal of Plaintiffs' Section 1981 claims.

R. Civ. P. 12(b)(6).  As more fully explained below, Defendants' arguments with respect to Plaintiffs' Section 1981 claims are not only baseless but ignore existing law, particularly a controlling case recently decided by Your Honor.

## II.   PLAINTIFFS ALLEGE VALID SECTION 1981 CLAIMS AS A MATTER OF FACT AND AS A MATTER OF LAW

In seeking the dismissal of Plaintiffs' Section 1981 claims, Defendants mistakenly rely on many cases in which the claims were dismissed for failure to adequately plead the elements of a Section 1981 claim.  Defendants, for example, cite to *Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988), where the Second Circuit found plaintiffs' claims of race discrimination as too conclusory and not pled with any particularity, holding that it is "[e]ssential to an action under Section 1981 [that plaintiffs'] . . . allegations [state] that the defendants' acts are purposefully discriminatory and racially motivated." *Albert*, 851 F.2d at 571.

Here, by contrast, the Complaint specifically alleges Plaintiffs' race (Caucasian) and contains numerous detailed allegations of Defendants' unlawful employment practices and retaliation against Plaintiffs due to their status as non-Asian/non-Japanese employees of MAC, and not simply naked allegations of racial discrimination. (Compl. ¶¶ 14-15, 41-60, 119-34). Thus, *Albert* is clearly inapplicable and provides no basis for dismissing Plaintiffs' well-supported Section 1981 race discrimination claims.

In *Ghose v. Century 21, Inc.*, No. 00-9165, 2001 WL 682369 (2d Cir. 2001),[5] the Second Circuit upheld the granting of a motion for summary judgment because the plaintiff "failed to present sufficient evidence to support an inference of illegal discriminatory motive." *Id.* at *2. The plaintiff in *Ghose* even admitted that he could not identify the racial or ethnic background of

---

[5]     Defendants' reliance on *Ghose* is totally inappropriate.  The Second Circuit's summary order in that case may not be considered as precedential authority as it was not published in the Federal Reporter and contains an express warning on the face of the decision in capitalized print not to cite to the case.

those individuals who were promoted over him. Unlike in the *Ghose* case, Plaintiffs have

provided numerous examples of Defendants' discriminatory behavior and identified the Asian

race of those whom Defendant MAC unlawfully treated more favorably. Moreover, at this

juncture, Plaintiffs' claims must be reviewed under the Rule 12(b)(6) standard, rather than the

more stringent Rule 56 summary judgment standard applicable in *Ghose*.

      Defendants also cite to *Ganthier v. North Shore-Long Island Jewish Health System,* 298

F. Supp. 2d 342 (E.D.N.Y. 2004), where a Section 1981 claim was dismissed because the

plaintiff not only failed to plead that there "was any intentional discrimination," but also failed to

allege that "race was even a factor in the change of her job duties." *Id.* at 348. *Ganthier,*

however, is also clearly distinguishable. Messrs. Long and Presto have not only alleged specific

acts of intentional discrimination, but have also clearly pled that race was the unlawful

motivation for such adverse employment actions. (Compl. ¶¶ 41-60, 80-102, 119-34). Indeed,

Defendants even acknowledge that the Complaint alleges that Plaintiffs "have 'suffered from a

concerted and continuous pattern and practice of disparate treatment' due to their 'race and/or

national origin with respect to the terms and conditions of employment at MAC.'" (*See* MAC's

motion to dismiss at 3, *quoting* Compl. ¶¶ 25, 29, 41).

      Having relied on entirely inapposite case law, including one case that Defendants cite in

violation of Second Circuit rules, to make the unavailing argument that the Complaint fails to

state a claim under Section 1981, Defendants resort to an argument that is even more spurious.

Remarkably, Defendants contend that, despite the actual allegations, the Complaint really does

not allege "race" discrimination based upon the fact that Plaintiffs are non-Asian, but rather only

alleges "national origin" discrimination based upon the fact that they are non-Japanese. This

argument fails both because it misrepresents Plaintiffs' actual allegations and because it ignores

contrary case law, including a recent decision of this Court.

### A.   Plaintiffs' Section 1981 Race Claims Are Based On The Fact That They Have Been Discriminated Against Because They Are Non-Asian Employees.

There has been no attempt at all by Plaintiffs to convert national origin claims under Title

VII into race claims under Section 1981, as argued in Defendants' motions to dismiss.

Defendants' argument deliberately ignores the plain allegations of the Complaint claiming that

Plaintiffs have suffered race-based discrimination and retaliation in violation of Section 1981

because they are non-Asian/non-Japanese employees.  In fact, there is an entire section of the

Complaint designated, "Defendants' Pattern and Practice of Unlawful Discrimination Against

*Non-Asian/Non-Japanese* Applicants and Employees." (*See* Compl. ¶¶ 41-60).  These allegations

state a claim for race discrimination and retaliation under Section 1981.  These allegations also

state separate and distinct claims for not only race, but also national origin discrimination and

retaliation under the NYSHRL and the NYCHRL based upon not only Plaintiffs' non-Asian

(Caucasian) race, but also their non-Japanese (American and Canadian) national origin.

Pretending as though Plaintiffs' allegations of discrimination based upon their non-Asian

race somehow disappear because they also allege discrimination based upon their non-Japanese

national origin, Defendants argue that Plaintiffs have "really pled" only national origin claims

because they are not Japanese.  Even the most strained reading of the Complaint does not support

Defendants' contorted argument.  Characterizing Plaintiffs' straight-forward allegations that they

suffered discrimination in favor of Asian/Japanese employees as a "pleading device," Defendants

contend that no claim of race discrimination favoring "Asians" can exist because the Asian

comparitors are all "Japanese."  Defendants go on to state, "[t]he fact that those Japanese

comparitors are also obviously all Asian is, of course, hardly a revelation." (MAC's motion to

dismiss at 9). Whether it is a "revelation" or not is hardly the point; it is a fact that is dispositive of their argument for dismissal on the contention that Plaintiffs have not stated a race-based claim under Section 1981.

Plaintiffs have not attempted to convert a Title VII claim based on national origin to a Section 1981 claim based on race to circumvent the exhaustion of the administrative process, as Defendants contend. Defendants refer to the fact that Plaintiffs have also filed Charges of Discrimination ("Charges") with the Equal Employment Opportunity Commission ("EEOC"), and will be seeking leave to amend the Complaint to add Title VII claims when the EEOC completes its investigation, in support of their argument that this is really a national origin case. However, Defendants completely ignore that Plaintiffs' EEOC Charges also allege claims of discrimination and retaliation based on race, as well as national origin. Thus, Plaintiffs' EEOC Charges do not support any inference that Plaintiffs' claims are in actuality limited to national origin claims under Title VII. In sum, therefore, Defendants' motions for dismissal of the Section 1981 claims is without merit based upon the facts alleged in Plaintiffs' Complaint.

**B.   Defendants' Section 1981 Dismissal Argument Is Not Warranted By Existing Law.**

Defendants' motions to dismiss the Section 1981 claims also fail on the law. The relevant case law, including the cases cited by Defendants and, most significantly, including a controlling case decided by Your Honor only eight months ago that Defendants did not address, shows that Defendants' motions are not well founded in law. More specifically, Defendants' motions to dismiss fail to cite, let alone address, the Court's recent decision in *Rigodon v.*

*Deutsche Bank Securities, Inc.*, No. 04 Civ. 2548, 2004 WL 2471859 (S.D.N.Y. Nov. 1, 2004),

rejecting the very argument for dismissal of a Section 1981 claim that Defendants assert here.[6]

In *Rigodon*, the plaintiff brought an action alleging, *inter alia,* that one or more of the

defendants subjected him to discrimination based on race, ethnicity and ancestry under Section

1981.  The defendants moved for summary judgment on all of the plaintiff's claims.  Your Honor

denied the motion for several reasons, all of which compel the same result here.

First, as Defendants argue here, the defendants in *Rigodon* claimed that Section 1981 is

not applicable to discrimination claims based on national origin.  Your Honor, however,

dismissed that argument as "oversimplified." *Rigodon,* WL 2471859, at \*4.  Referring to Justice

Brennan's concurrence in *St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987),[7] which states

that the "line between discrimination based on 'ancestry or ethnic characteristics,' and

discrimination based on 'place or nation of . . . origin,' is not a bright one," Your Honor

articulated the distinction between race-based claims under Section 1981 and national origin

claims that is dispositive of the motions to dismiss now before the Court. *Rigodon,* WL 2471859

at \*4.  Second, and most significantly for the purpose of this instant motions, Your Honor denied

the defendants' summary judgment motion finding that, if "plaintiff can prove he was subjected

to discrimination of some kind, the question of the nature of the discrimination is a factual one."

*Id.*  This holding carries even more force here, where Defendants seek to dismiss Plaintiffs'

Section 1981 case under Rule 12(b)(6).  Finally, Your Honor analyzed the allegations in the

amended complaint and found the defendants' argument meritless that plaintiff failed to plead

the elements of Section 1981, specifically, intentional and purposeful discrimination on the basis

---

[6]    As such, Defendants' continued assertion of this argument violates Fed. R. Civ. P. 11. (*See* Plaintiffs' Motion for Rule 11 Sanctions).

[7]    Discussed, *infra.*

of race or ethnicity. *Id.* Plaintiffs are confident that the Court will reach the same conclusion here upon review of the allegations set forth in Plaintiffs' Complaint.

Regardless of their attempts to distinguish the case, Defendants' argument cannot be squared with Your Honor's holding that determining the nature of the discrimination in a Section 1981 claim is an issue of fact for the jury. *Rigodon*, 2004 WL 2471859 at *4. Thus, based upon *Rigodon* alone, Defendants' Section 1981 dismissal argument fails.

*Rigodon,* however, is not the only decision that precludes Defendants' argument. Additionally, in *Adames v. Mitsubishi Bank, Ltd.*, 751 F. Supp. 1548 (E.D.N.Y. 1990), the Honorable Charles P. Sifton denied summary judgment where four women (three Caucasian/American and one Hispanic/American) brought a Section 1981 claim against their employer, the Japanese-owned Mitsubishi Bank. Although Judge Sifton recognized that "an individual or class cannot sustain an action under Section 1981 that claims discrimination solely on the basis of nation origin," he noted that, "[a] number of courts have recognized that 'the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible.'" *Id.* at 1558-59. (citing *Enriquez v. Honeywell, Inc.,* 431 F. Supp. 901, 904 (W.D. Okla. 1977)). Judge Sifton found that the Plaintiffs were claiming employment discrimination based upon "their status as non-Orientals and not just because of their American citizenship." *Id.* at 1559.

In *Adames,* Judge Sifton cited two more cases in which courts rejected the same race and national origin argument that Defendants assert here. The first case is *Spiess v. C. Itoh & Co.,* 408 F. Supp. 916 (S.D. Tex. 1976), which involved a class of white American citizens who filed a lawsuit on behalf of themselves and other personnel of non-Japanese national origin who had been discriminated against by a Japanese-owned corporation. The court in *Spiess* recognized

17

that "'national origin' discrimination was indistinguishable from 'racial' discrimination." *Adames*, 751 F. Supp. at 1560 (citing *Spiess*, 408 F. Supp. 916).  Thus, the three white American plaintiffs had standing under Section 1981 to represent a class of "non-Oriental, non-Japanese" persons that included non-white citizens. *Id.*

The second case is *Bullard v. Omi Georgia, Inc.*, 640 F.2d 632 (5th Cir. 1981).  In *Bullard*, black and white employees alleged discrimination in violation of Section 1981 when they were fired and replaced by employees whose race was Asian and whose national origin was Korean.  The plaintiffs in *Bullard* charged that they had been discriminated against on the basis of race and national origin.  The court denied the defendants' summary judgment motion noting that summary judgment is always questionable in employment discrimination cases involving motive and intent, particularly where the issue is nation origin versus race. *See Bullard*, 640 F.2d at 634.  The Fifth Circuit went on to state: "Appellants have stated and supported a case of racial discrimination.  The line between national origin and racial discrimination is an extremely difficult one to trace.  An attempt to make such a demarcation before both parties have had an opportunity to offer evidence at trial is inappropriate." *Id.* at 634-35.  In light of these cases, all of which Defendants omitted from their motion papers, as well as the allegations of racial discrimination pled by Plaintiffs, Defendants' motions to dismiss the Section 1981 claims should be denied.

## C.    Defendants' Selective Citation Of Existing Law Cannot Conceal The Motions' Lack of Merit.

In addition to the failure to address four contrary cases that are directly on point, the motions fare not better under the cases that Defendants do cite.  For example, Defendants cite *St. Francis College*, 481 U.S. 604, and rely upon that decision for the proposition that the Supreme Court and the Second Circuit have "left no doubt that [Section] 1981 does not reach national

origin discrimination." *See* MAC's motion to dismiss at 10. That is a novel reading of the *St. Francis* decision given that the Court held, "If respondent on remand can prove that he was subjected to intentional discrimination based upon fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981." *St. Francis*, 481 U.S. at 613. What Defendants also view with blinders on is Justice Brennan's concurrence in *St. Francis*, noting that the lack of a bright-line distinction under Section 1981 between discrimination based on ancestry or ethnic characteristics and discrimination based on place or nation of origin. *Id.* at 614.

The very same point was made eight years earlier in *Avigliano v. Sumitomo Shoji Am., Inc.*, 473 F. Supp. 506 (S.D.N.Y. 1979),[8] another case inexplicably cited by Defendants. The district court in *Avigliano* stated that "a few courts have held that if national origin discrimination is motivated by or indistinguishable from race discrimination, a claim will be actionable under Section 1981." *Id.* at 514.

As with the *St. Francis* decision, Defendants choose to see *Avigliano* only in a light that supports their argument. Defendants contend, without analysis of the facts, that *Avigliano* is analogous because the court saw the plaintiffs as "strain[ing] to fit their grievances into the mold of racial discrimination." *Avigliano*, 473 F. Supp. at 514. However, the facts in *Avigliano* are quite different from the allegations in Plaintiffs' Complaint. In *Avigliano*, the court dismissed the plaintiffs' Section 1981 claim after determining that they alleged only that the company favored "citizens of Japan" and could not equate claims that they were "discriminated against because they are Not [sic] Japanese nationals with discrimination based on their race." *Id.* Plaintiffs Long and Presto of course do not only allege discrimination because they are not

---

[8] *Vacated and remanded on other ground*, 638 F.2d 522 (2d Cir. 1981), *rev'd and remanded on other grounds*, 457 U.S. 176 (1982).

"Japanese nationals" or because they are not "citizens of Japan." Rather, the discrimination alleged in Plaintiffs' Complaint is far broader and encompasses race discrimination as well based upon allegations that they suffered adverse employment actions because they are non-Asian employees.[9]

Therefore, the Complaint states a claim for race-based discrimination under Section 1981 and should not be dismissed.

## III.    PLAINTIFFS' SECTION 1981 RETALIATION CLAIMS ARE VALID

For the same reasons that require rejection of their arguments for dismissal of Plaintiffs' discrimination claims, Defendants' motions to dismiss Plaintiffs' retaliation claims under Section 1981 must also fail. As alleged in the Complaint, Plaintiffs were subjected to various forms of unlawful retaliation from Defendants, which ranged from being excluded from business-related meetings and having their duties stripped away to being put on administrative leave without cause and threatened with immediate termination of their employment if they did not appear for interrogation at the offices of MAC's outside counsel on less than 24 hours' notice. (*See* Compl. ¶¶ 122, 129). Based upon Defendant Van Dorn's retaliatory denial of the validity of Plaintiffs' Severance Agreements, Defendants further threatened to falsely report to the FBI that Plaintiffs were conspiring to extort millions of dollars from MAC. *Id.* ¶ 127. In addition to these adverse employment actions and threats, MAC executives distributed a company-wide e-mail defaming Plaintiffs by portraying them as criminals who were engaged in an extortion conspiracy. *Id.* ¶¶ 131-34. These and other acts by Defendants against Plaintiffs were so obviously retaliatory in nature that they were constructively discharged from their positions at MAC.

---

[9]        The same is true in *Porto v. Canon, USA Inc.,* No. 81-C-1305, 1981 WL 381 (N.D. Ill. Sept. 9, 1981), involving allegations solely of national origin discrimination. Moreover, *Porto* is of questionable validity because it pre-dates the Supreme Court's decision in *St. Francis.*

As stated above, Plaintiffs have clearly alleged in the Complaint that they suffered these retaliatory acts because they complained about the violation of their Section 1981 rights and those of other non-Asian/non-Japanese employees of MAC. (*See id.* ¶¶ 41-60). Plaintiffs have also pled, in great detail, that they were subsequently retaliated against for complaining about these Section 1981 violations. (*See* Compl. ¶¶ 80-118, 119-42). Therefore, contrary to Defendants' false assertions, the Complaint sufficiently states claims for race-based retaliation under Section 1981, and these claims should not be dismissed.

## IV.   DEFENDANTS' ARGUMENT AGAINST THE EXERCISE OF SUPPLEMENTAL JURISDICTION IS FUTILE

Defendants spend an inordinate portion of their motion papers arguing the merits of supplemental jurisdiction. Specifically, Defendants argue that after dismissal of the Plaintiffs' Section 1981 claims, Plaintiffs' state and local law claims should be dismissed as well pursuant to Fed. R. Civ. P. 12(b)(1) and 28 U.S.C. § 1367(c)(3). Because Plaintiffs' Section 1981 claims are not subject to dismissal, the Court may continue to hear Plaintiffs' "pendent" state and city law claims. Additionally, as stated above, Plaintiffs will be seeking leave to amend the Complaint to assert additional federal claims under Title VII once they receive right-to-sue letters from the EEOC. Therefore, the Court should continue to exercise supplemental jurisdiction over Plaintiffs' NYSHRL and NYCHRL claims as well as Plaintiffs' common law claims.

## V.   THE COMPLAINT STATES A VALID CLAIM FOR DEFAMATION

Defendants attempt to escape liability for the defamation that they have committed against Plaintiffs by arguing variously that the e-mail at issue is a protected communication or that Plaintiffs' allegations are deficient. As more fully explained below, Defendants' arguments for dismissal of Plaintiffs' defamation claim are baseless and should be rejected.

A.    **Section 74 Of The New York Civil Rights Law Provides No Basis For Dismissal.**

First, Defendants attempt to defend the defamatory e-mail by invoking Section 74 of the New York Civil Rights Law ("Section 74"), which protects "out-of-court communications" regarding "issues in litigation." However, the protection of Section 74 is limited to reports of judicial proceedings made in the public interest. *See Williams v. Williams,* 23 N.Y.2d 592, 599, 298 N.Y.S.2d 473, 479 (1969) ("it was never the intention of the Legislature in enacting section 74 to allow 'any person' to maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute"). As such, Section 74 is inapplicable to Defendants' internal, company-wide e-mail defaming Plaintiffs.

Defendants' claim that Section 74 affords them absolute protection from liability since the e-mail relates to "pending litigation" and bears directly "on the issues in litigation." *See* MAC's motion to dismiss at 18. The defamatory communication at issue, however, was an internal, company-wide e-mail sent to MAC employees. Accordingly, it cannot possibly have been made "in the public interest" as required to receive the limited protection of Section 74. Indeed, "[a] party who maliciously asserts false and defamatory charges in judicial proceedings for the purpose of publicizing them in the press is not entitled to claim immunity, statutory or otherwise." *Id.* at 599. Given the fact that Defendants maliciously sent a defamatory e-mail throughout the *entire* Company to *all* MAC employees for the purpose of smearing Plaintiffs as criminals, the e-mail falls well outside the parameters of Section 74's protection. Thus, the Court should reject Defendants' attempt to invoke Section 74 to protect themselves from liability for the defamation contained in that communication.

Additionally, the cases relied upon by Defendants to support their argument involve clearly distinguishable instances where an attorney made comments to the press about the contents of a publicly-filed pleading or two opposing attorneys spoke publicly about pending litigation on the courthouse steps or a party made in-court statements during the course of the litigation, all of which were found to be protected speech under Section 74. Unlike those cases, the e-mail here was not issued to discuss the merits of a pleading or pending litigation, but rather to disparage Plaintiffs by falsely portraying them as criminals utilizing the legal process to pursue a scheme to extort money from MAC.

**B.      The E-Mail Is Not A Statement Of Opinion.**

Second, Defendants claim that the e-mail, particularly the first and last sentences, consists of statements of pure opinion, which is not actionable. This argument is totally without merit. "In all defamation cases, the threshold issue which must be determined, as a matter of law, is whether the complained of statements constitute fact or opinion. If they fall within the ambit of 'pure opinion,' then even if false and libelous, . . . such statements are safeguarded and may not serve as the basis for an action in defamation." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289, 508 N.Y.S.2d 901 (1986). "A nonactionable 'pure opinion' is a statement of opinion accompanied by a recitation of the facts upon which it is based. An opinion not accompanied by such a factual recitation may, nevertheless, be 'pure opinion' if it does not imply that it is based upon undisclosed facts." *Id.*

In the alternative, when a defamatory statement of opinion implies that it is based upon undisclosed detrimental facts which justify the opinion but are unknown to those reading or hearing it, it is a "mixed opinion" and is actionable. *Id.* at 289-90. The actionable part of a "mixed opinion" is not the false opinion, but rather the implication that the speaker knows

23

certain facts, unknown to his/her audience, which support his/her opinion and are detrimental to the person about whom he/she is speaking. *Id.* at 290; *see Public Relations Society of America v. Road Runner High Speed Online,* Index No. 116210/04, 2005 WL 1364381 at *5 (N.Y. Sup. Ct., N.Y. Cty. May 27, 2005)) ("[t]he writer of the e-mail implies that his opinion, as a whole, is shared by other persons in the organization who are not named. Thus, there is a basis on which the reader can evaluate the opinion of others alleged to share the same views as the writer of the email . . . [s]uch statements of mixed opinion [and fact] are actionable").

In the instant case, Defendants attempt to support their argument that the first and last sentences of the e-mail contain expressions of opinion by pointing to selective phrases from those very sentences, such as "we believe" and that MAC would not pay "the outrageous amounts of money . . . to which they are absolutely not entitled." *See* MAC's motion to dismiss at 20. Defendants' selective focus on those phrases seeks to mislead the Court with respect to the defamatory nature of the e-mail. Indeed, this is revealed most clearly in the last sentence of the e-mail that, "when the Company made it clear that it would not pay the outrageous amounts of money demanded, the two individuals filed the litigation, claiming that they had been acting only for the purpose of improving the company." This is clearly not an opinion, but an assertion of alleged facts, which we will prove at trial to be false. As such, it is actionable.

The e-mail at issue, at most, may be considered a "mixed opinion," since it begins with "[w]e believe" which implies Defendant Sonobe, the sender of the e-mail, shares his opinion of Plaintiffs with other executives at MAC, including Defendants Sakamoto and Saito, and concludes with a false assertion of fact that accuses Plaintiffs of committing extortion. This defamatory statement has damaged their professional reputations and impugned their personal character. (Compl. ¶ 132). Thus, the e-mail implies that Defendants Sonobe, Saito and

24

Sakamoto know certain facts, unknown to the readers [the entire workforce at MAC], which support their opinion. Most, if not all, of Plaintiffs co-workers do not know the facts that precipitated the e-mail and have been misled into believing that Plaintiffs are mere criminals attempting to extort millions from the Company. Therefore, the e-mail should not receive "absolute protection" as statement of opinion, and Defendants' arguments to the contrary should be rejected.

### C.    The E-mail Is Not Subject To A Qualified Privilege.

Third, Defendants' argument that the e-mail is protected by a qualified privilege should likewise be rejected. "[A] qualified privilege attaches to otherwise actionable words when '[a] communication [is] made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty." *Elmore v. Shell Oil Co.,* 733 F. Supp. 544, 546 (E.D.N.Y. 1988) (quoting *Shapiro v. Health Ins. Plan of Greater New York,* 7 N.Y.2d 56, 60, 194 N.Y.S. 2d 509 (1959)). To be protected by this privilege, the defendant "must have a good faith belief that the information is true." *See Hofmann v. District Council 37*, 99 Civ. 8636, 2004 WL 1936242 at *6 (S.D.N.Y. Aug. 31, 2004). Moreover, "[t]he shield provided by qualified privilege may be dissolved if plaintiff can demonstrate that defendants spoke with malice." *Liberman v. Gelstein,* 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857 (1992).

" 'Malice' sufficient to defeat qualified privilege may be *either* of the common law or of the constitutional variety." *Id.* at 437-38. "Common-law malice '[m]eans spite or ill will' and will defeat the privilege only if it is the one and only cause for publication." *Id.* at 439 (internal citations omitted). "Constitutional or 'actual' malice means publication 'with [a] high degree of awareness of [the publication's] probable falsity' or while 'the defendant in fact entertained serious doubts as to the truth of the publication.'" *Id.* at 438.

Here, a qualified privilege does not attach to the e-mail because Defendants' did not have a good faith belief that it was true. More specifically, Defendant Saito confirmed verbally and in writing the validity of Plaintiffs' Severance Agreements. (Compl. ¶¶ 39-40). Thus, Defendants clearly knew that the e-mail falsely asserting otherwise was not true.

Even if the Court concludes that a qualified privilege attaches to the e-mail, Plaintiffs have pled sufficient facts in the Complaint to show that Defendants distributed the e-mail with both actual and common-law malice. For example, despite Defendant Saito's knowledge of the validity of Plaintiffs' Severance Agreements, the e-mail stated that: "We believe that the two individuals have advanced their allegations as part of an effort to collect an unbelievably large amount of money of more than $4.5 million each, by way of severance agreements to which they are absolutely not entitled." (Compl. ¶ 132). This false statement, coupled with Defendant Saito's prior admission regarding Plaintiffs' Severance Agreements, is a clear example that Defendants Sonobe, Sakamoto and Saito distributed the e-mail with actual malice.

Defendants Sakamoto and Saito also knew that Plaintiffs had repeatedly attempted to bring an end to the unlawful discrimination, accounting fraud and other wrongdoing within the Company before they filed their suit. Indeed, these Individual Defendants admitted in writing, several times, that no remedial action had been taken. (Compl. ¶¶ 111-12, 114, 117). Thus, Defendants Sakamoto and Saito had absolutely no good faith belief to claim in the e-mail that: "[w]hen the Company made it clear that it would not pay the outrageous amounts of money demanded, the two individuals filed the litigation, claiming that they had been acting only for the purpose of improving the company." (Compl. ¶ 132). This false statement, together with the admissions by Defendants Saito and Sakamoto that no actions had been taken to correct the

unlawful conduct and fraud at MAC, is evidence that the e-mail was distributed maliciously out of spite or ill-will.

Moreover, it is simply ridiculous for Defendants to contend that every single employee at MAC, from the highest-ranking official to the lowest-level employee, had an interest or a duty to receive the e-mail.  To the contrary, the e-mail was sent with malice to severely damage the character, integrity and reputation of Plaintiffs in the eyes of all of the employees at MAC by claiming they were mere criminals attempting to extort $10 million from the Company.  As stated above, Defendants also sent the e-mail in retaliation for their internal complaints about the discrimination and other unlawful conduct at MAC and because they chose to bring this action, which shows further malice on the part of Defendants.

Defendants' reliance on *Hollander v. Cayton*, 145 A.D.2d 605 (2nd Dept. 1988), which involved a "nonactionable opinion," is of no consequence.   In *Hollander*, the defendant was the president of a hospital's professional staff and stated during a staff meeting that the plaintiff, the chairman of the pediatrics department was "immoral", "unethical", and had "mismanaged cases." *Id.* at 606.  The appellate court in *Hollander* found that "the statements by defendant were indefinite, ambiguous and incapable of being objectively characterized as true or false.  Further, an examination of the full context of the communication as well as the setting in which these remarks were made supports the conclusion that these declarations were accepted by the audience as opinion rather than statements of fact." *Id.*

In this instance, the e-mail at issue was definite and not in any way ambiguous regarding the false accusation of criminal conduct by Plaintiffs.  Defendants Sonobe, Sakamoto and Saito clearly accused Plaintiffs of engaging in a conspiracy to extort money from MAC.  At the time the e-mail was distributed, Plaintiffs had been put on administrative leave and were no longer

actively working at MAC.  Thus, it is highly probable that the recipients of the e-mail interpreted the false allegations about Plaintiffs in that communication to be statements of fact and to believe that Mr. Long and Mr. Presto were removed from the workplace because of this alleged unlawful or improper conduct.

Defendants' reliance on *Carone v. Venator Group, Inc.*, 11 A.D.3d 399 (1st Dept 2004) is also misplaced.  In *Carone,* the defendant employer, issued a statement about the plaintiffs, who were suspended employees.  The statement voiced a "concern" about "unauthorized persons leaking information to analysts, and that the [plaintiffs'] suspension was in connection with that internal investigation." *Id.* at 400.  However, the issued statement went on "to caution that the suspension was not a judgment that plaintiffs were guilty of any wrongdoing, but any employee found to have leaked information would be subject to swift disciplinary action." *Id.*  The statements at issue in *Carone* were "subject to a qualified 'common interest' privilege, which protects good faith communications between employees and management regarding the employer's business." *Id.*  Unlike in *Carone*, Plaintiffs here were portrayed as criminals involved in an extortion and no similar cautionary statement affirming Plaintiffs' innocence was included in the e-mail.

Therefore, Defendants' argument that the e-mail is protected by a qualified privilege should be dismissed.

**D.      Plaintiffs' Defamation Claims Satisfy Fed. R. Civ. P. 8 Pleading Standards.**

The arguments by Defendants Sakamoto, Saito and Sonobe regarding the sufficiency of Plaintiffs' defamation claims pursuant to Fed. R. Civ. P. 8 should also be rejected.  Rule 8 requires averments to be "'simple, concise, and direct,' and not by such a state pleading requirement as CPLR 3016 (a)." *Odom v. Columbia Univ.,* 906 F. Supp. 188, 196 (S.D.N.Y.

1995) (quoting *Kelly v. Schmidberger,* 806 F.2d 44, 46) (2d Cir. 1986). Moreover, under Rule 8,

"a Complaint for defamation need not contain the defamatory statements *in haec verba* as long

as it affords defendant 'sufficient notice of the communications complained of to enable him to

defend himself.'" *See id.* at 196. More specifically, the liberal pleading standard for defamation

is satisfied by an adequate identification of the purported communication, and an identification

of who made the communication, when it was made, and to whom it was communicated. *Reeves

v. Continental Equities Corp. of Am.,* 767 F. Supp. 469, 473 (S.D.N.Y. 1991), *aff'd in part, rev'd

in part,* 912 F.2d 37 (2d Cir. 1990). Plaintiffs have pled all of these facts in the Complaint.

Moreover, courts in the Second Circuit have upheld complaints that do not specifically

plead the alleged defamatory word. *See, e.g., Kalika v. Stern,* 911 F. Supp. 594, 603 (E.D.N.Y.

1995) (finding "[c]omplaints which do not specifically plead the allegedly defamatory words

have been held sufficient"); *Korry v. International Tel. & Tel. Corp.,* 444 F. Supp. 193, 196

(S.D.N.Y. 1978) (finding that plaintiff did not plead purportedly defamatory language in

Complaint, but New York's strict pleading standard does not apply in federal court). Indeed,

Defendants admit that the specificity requirements under New York State law do not apply to

pleadings of defamation filed in federal court. *See* Individual Defendants' motion to dismiss, p.

4.

Here, the Complaint clearly describes the substance of the defamatory e-mail, states the

identity of those responsible for its distribution, the date of the communication, and the

recipients. Moreover, Plaintiffs allege, upon information and belief, that to date the Individual

Defendants and others at MAC continue to make defamatory statements similar to the ones

contained in the e-mail. (Compl. ¶ 137). The Complaint thus clearly places Defendants "on

notice" of the defamation claims.  Therefore, Plaintiffs' defamation claims sufficiently satisfy

Rule 8's liberal pleading requirements for defamation and should not be dismissed.

## VI.   PLAINTIFFS HAVE ASSERTED VALID DISCRIMINATION, RETALIATION AND AIDING AND ABETTING CLAIMS AGAINST INDIVIDUAL DEFENDANTS SONOBE AND VAN DORN

Defendants Sonobe and Van Dorn's arguments regarding the sufficiency of the facts in

support of the discrimination and aiding and abetting claims brought against them are baseless.

Fed. R. Civ. P. 8(a)(2) states that a Complaint must include " a short plain statement of the claim

showing that the pleader is entitled to such relief." *See* Fed. R. Civ. P. 8(a)(2).  Such a statement

must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon

which it is rests." *Conley,* 355 U.S. at 47.  "This simplified notice pleading standard relies on

liberal discovery rules and summary judgment motions to define disputed facts and issues and to

dispose of unmeritorious claims." *Id.* at 47-48.  Given the liberal pleading standards of the

federal rules, "[a] court may dismiss a Complaint only if it is clear that no relief could be granted

under any set of facts that could be proved consistent with the allegations." *Id.* at 41.  However,

"[a]s a matter of procedure, [if] a Complaint is dismissed pursuant to Rule 12(b)(6) and the

plaintiff requests permission to file an amended Complaint, that request should ordinarily be

granted." *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir. 1991).

Here, Plaintiffs allege that Defendant Sonobe "participated directly in the unlawful

retaliatory conduct against Plaintiffs, and in numerous other unlawful and/or improper acts about

which Plaintiffs repeatedly complained." (Compl. ¶ 20).  They also allege violations of

discrimination and harassment pursuant to the Section 1981, the NYSHRL and NYCHRL

against all Defendants in Counts I, III and VI of the Complaint.  Although Defendant Sonobe is

not specifically mentioned by name in those claims, he is sufficiently put on notice as an

executive of Defendant MAC that he is alleged to have discriminated and harassed Plaintiffs because they were non-Asian/non-Japanese employees of MAC.

As for Defendant Van Dorn, he fostered an unlawful discriminatory environment at MAC which adversely affected non-Asian/non-Japanese employees, including Plaintiffs. (Compl. ¶¶ 19, 70-79). As explained above, Defendant Van Dorn was the "senior executive at MAC charged with implementing and enforcing MAC's purported Equal Employment Opportunity and anti-discrimination policies." (Compl. ¶ 70). However, he was responsible for some of the very same discriminatory conduct against which Plaintiffs were complaining in their efforts to bring about an end to such conduct at MAC.

Defendant Van Dorn also retaliated against Plaintiffs in his own right and aided and abetted MAC's retaliatory actions against Plaintiffs after learning of their complaints and efforts to eradicate discrimination and other unlawful conduct at MAC. Although he had retired from MAC, Defendant Van Dorn retaliated against Plaintiffs by falsely denying the validity and/or existence of the Severance Agreements that he had provided to Plaintiffs while he still worked as Executive Vice President of Human Resources at MAC. While not expressly set out in the Complaint, Defendant Van Dorn's retaliatory denial of the validity and/or existence of the Severance Agreements is an undisputed fact necessarily underlying the retaliation allegations surrounding Proskauer's purported "investigation" of the validity of Plaintiffs' Severance Agreements. (*See* Compl. ¶¶ 127-30). Specifically, Plaintiffs suffered retaliation in the form of repeated and baseless threats to go to the FBI and falsely accuse Plaintiffs of engaging in a conspiracy to extort millions of dollars from the Company premised upon Defendant Van Dorn's false denial of the validity of Plaintiffs' Severance Agreements. (*Id.* ¶ 127). In fact, Plaintiffs will prove at trial that Defendant Van Dorn's denial of the Severance Agreements was in

retaliation because Plaintiffs revealed his role in cultivating the discriminatory environment at

MAC.  Moreover, as a further result of Defendant Van Dorn's retaliatory denial of the Severance

Agreements, Plaintiffs were placed on administrative leave without cause (Compl. ¶ 129) and

required to appear at Proskauer, with less than 24 hours' notice, for interviews in connection

with an alleged investigation into the validity of the Severance Agreements.  (*Id.* ¶ 130).

As previously noted, upon conclusion of the EEOC's investigation of Plaintiffs'

Charges, Plaintiffs will seek leave to amend the Complaint to add Title VII claims.  If the Court

deems necessary, Plaintiffs will also amend the Complaint to specify Defendant Sonobe, by

name, in the discrimination claims and to make more explicit the allegations as to Defendant Van

Dorn's undisputed denial of the validity and/or existence of Plaintiffs' Severance Agreements, in

retaliation against Plaintiffs.  Therefore, at this early juncture in the litigation and in keeping with

the liberal pleading standards of Fed. R. Civ. P. 8(a)(2), the aiding and abetting claims and

retaliation claims should not be dismissed as against Defendant Sonobe or Van Dorn.

## VII.   DEFENDANTS' MOTIONS TO STRIKE SHOULD BE DENIED IN THEIR ENTIRETY

### A.   Standard Of Review For A Motion To Strike.

"Fed. R. Civ. P. 12(f) allows a party to request that the Court strike from the pleading

'any redundant, immaterial, impertinent, or scandalous matter.'" *Smith v. AVSC Int'l, Inc.,* 148 F.

Supp. 2d 302, 317 (citing Fed. R. Civ. P. 12(f)).  However, "[m]otions to strike are generally

disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue

in dispute." *Zinaman v. USTS New York, Inc.,* 798 F. Supp. 128, 135 (S.D.N.Y. 1992).  "If there

is any doubt whether the challenged matter may raise an issue of fact or law, the motion to strike

should be denied, and the sufficiency of the allegations left for the adjudication on the merits."

*Sunshine Cellular v. Vanguard Cellular Systems, Inc.,* 810 F. Supp. 486, 499-500 (S.D.N.Y.

1992) (citing WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d §1382, at 697-700);
*see also Zinaman v. USTS New York, Inc.*, 798 F. Supp. 128, 135 (S.D.N.Y. 1992) (denying
motion to strike because allegations, if true, may be relevant to defendants' motives); *Crespo v.
NYC Transit Auth.*, 01-CV-0671, 2002 WL 398805 (E.D.N.Y. Jan. 7, 2002) (denying motion to
strike because allegations were relevant to proving discriminatory intent).

The Second Circuit has noted that, "[i]n deciding whether to grant a Rule 12(f) motion on
the ground that the matter is impertinent and immaterial, it is settled that the motion will be
denied, unless it can be shown that no evidence in support of the allegation would be
admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (quoting
*Gleason v. Chain Serv. Restaurant*, 300 F. Supp. 1241, 1257 (S.D.N.Y. 1969), *aff'd per curiam*,
422 F.2d 342 (2d Cir. 1970). In *Lipsky*, the Second Circuit reversed the district court's grant of a
motion to strike in full and modified which portions of the Complaint were stricken, stating that:

> "[e]videntiary questions . . . should [] be avoided at such a preliminary stage of the
> proceedings. Usually the questions of relevancy and admissibility in general require the
> context of an ongoing and unfolding trial in which to be properly decided. And
> ordinarily neither a district court nor an appellate court should decide to strike a portion
> of the Complaint on the grounds that the material could not possibly be relevant on the
> sterile field of the pleadings alone."

*Lipsky*, 551 F.2d at 893.

## B.     All Of Plaintiffs' Allegations Are Material To Their Claims And Capable Of Being Proved With Admissible Evidence.

Contrary to Defendants' assertions, Plaintiffs' allegations regarding employment law and
immigration law violations, accounting fraud and other misconduct complained about by
Defendants in their motions to strike are relevant, particularly with respect to Plaintiffs' cause of
action for a declaratory judgment. The allegations go directly to whether Defendants'
discriminatory and retaliatory conduct against Plaintiffs constitutes a constructive discharge

and/or "good cause" for Plaintiffs to terminate their employment at MAC and thereby entitles Plaintiffs to receive contractual severance payments. The allegations, therefore, are not immaterial, impertinent or scandalous and do not unfairly seek to prejudice Defendants in any way. To the contrary, these allegations provide an adequate basis to support Plaintiffs' arguments that their working conditions were so intolerable that they resulted in their constructive discharge.

Additionally, this case is at an early stage of the litigation. Indeed, Defendants have not even filed their Answer to the Complaint. Any questions of relevancy and/or admissibility, therefore, require further assessment during pre-trial litigation. Accordingly, Defendants' motions to strike should be denied in their entirety.

In the Second Circuit, "[a] constructive discharge occurs when the 'employer deliberately makes an employee's working conditions so intolerable that the employee is forced into voluntary resignation.'" *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (quoting *Young v. Southwestern Savings & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)). Moreover, in order for a plaintiff to succeed on a claim for constructive discharge, "[t]he trier of fact must be convinced that the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have been compelled to resign." *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977).

In the instant case, Plaintiffs have alleged that they are no longer able to work under the unlawful, and extremely adverse circumstances that exist at MAC. (Compl. ¶139). They also assert that they have been constructively discharged and/or have "good cause" to terminate their employment with MAC. (Complaint ¶ 142). In support of these allegations, Plaintiffs specifically describe in the Complaint numerous acts of discrimination, unlawful conduct, and

other wrongdoing by Defendants. They also describe many acts of unlawful retaliation that Defendants have committed against them. Thus, the allegations at issue clearly explain why Plaintiffs have been effectively constructively discharged from MAC, and thus should not be stricken.

Additionally, the cases relied upon by Defendants are clearly distinguishable. For example, in all three cases cited from this district by Defendants, the claims of constructive discharge were denied because, unlike here, they did not rise to the level of intolerability to force the plaintiffs to leave their jobs. *See Mandel v. Champion Int'l Corp.,* 361 F. Supp. 2d 320 (S.D.N.Y. 2005) (finding criticism of job performance, denial of raise and/or performance and being spied on at work was not so intolerable as to force plaintiff into involuntary resignation); *see Ongsiako v. City of New York,* 199 F. Supp. 2d 180 (finding transfer of job site with no change in job duties and back injury preventing plaintiff from performing heavy lifting did not state a claim for constructive discharge); *see Esterquest v. Booz-Allen & Hamilton, Inc.,* 97 Civ. 6957, 2002 WL 237846 (being dissatisfied with raises, promotions and appraisals does not establish a prima facie case of constructive discharge).

All of the paragraphs at issue, including those relating to Proskauer's involvement in the improprieties at MAC, must remain in the Complaint because they fully describe the pervasive unlawful discrimination and other wrongdoing existing at MAC. They also explain how Plaintiffs went from high-ranking senior executives at MAC to being placed on administrative leave without cause and being repeatedly threatened by Defendants, through Proskauer, with an FBI investigation on trumped up federal criminal charges. Thus, striking paragraphs from the Complaint would result in a disjointed and incomplete account of the extent of the unlawful

discrimination, fraud and other misconduct at MAC as well as the retaliatory actions that

Defendants have taken against Plaintiffs.

## **CONCLUSION**

For all of the foregoing the reasons, Plaintiffs' respectfully request that this Court deny

Defendants' motions to dismiss and motions to strike in their entirety.


Dated: June 30, 2005
         New York, New York


                              Respectfully submitted,

                              THOMPSON WIGDOR & GILLY LLP

                              By:

                              Kenneth P. Thompson (KT-6026)
                              Scott Browning Gilly (SG-6861)
                              Douglas H. Wigdor (DW-9737)

                              350 Fifth Avenue, Suite 5720
                              New York, New York 10118
                              Telephone: (212) 239-9292
                              Facsimile: (212) 239-9001