UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                   :

KEVIN LONG and LUDVIC PRESTO,        :
                                   :

                Plaintiffs,    :        05 Civ. 0639 (GEL)
                                   :

        -v-                :        **OPINION AND ORDER**
                                   :

MARUBENI AMERICA CORP., et al.,     :
                                   :

                Defendants.    :
---------------------------------------------------------------x

Kenneth P. Thompson, Scott Browning Gilly, and
Douglas H. Wigdor, Thompson Wigdor & Gilly LLP,
New York, NY, <u>for plaintiffs Long and Presto</u>.

Kenneth Taber, Pillsbury Winthrop Shaw Pittman LLP,
New York, NY, <u>for defendant Marubeni America
Corporation</u>.

Gregory I. Rasin, Steven D. Hurd, Elizabeth Cowitt,
Jackson Lewis LLP, New York, NY, <u>for defendants
Sakamoto, Saito, Van Dorn, and Sonobe</u>.

GERARD E. LYNCH, District Judge:

       Plaintiffs Kevin Long and Ludvic Presto, executives of defendant Marubeni America

Corporation, bring this action against their employer and various present and former supervisors,

charging that they were discriminated against on the basis of race in violation of 42 U.S.C. §

1981, and alleging various pendant state causes of action. Defendants move to dismiss on

various grounds, or in the alternative, to strike various portions of the complaint. Plaintiffs

cross-move for sanctions pursuant to Fed. R. Civ. P. 11. Although the parties have deluged the

Court with voluminous submissions, once the posturing and invective filling the papers are

ignored, the substantive issues presented by the motions can be disposed of relatively easily. The

Court declines to indulge the parties' efforts to waste their own and the Court's resources with satellite motions designed more to tar their adversaries than to reach the merits of the case. The defendants' motion to dismiss will be granted in part and denied in part; defendants' motion to strike and plaintiffs' motion for sanctions will be denied.

I.    Race Discrimination

In Count I of their complaint, plaintiffs claim that they were discriminated against on the basis of their race, alleging that Marubeni disfavored them as Caucasians and gave preferential treatment to Asian employees. Defendants argue that the complaint fails to state a claim, because the allegations (as construed by defendants) state a claim only for national origin discrimination, which is not prohibited by § 1981. The argument is without merit.

Defendants may well be correct that plaintiffs' claims will ultimately prove more persuasive if stated as claims for national origin discrimination, in violation of Title VII of the Civil Rights Act of 1965, and that the charges of racial discrimination are essentially tactical and designed to begin a lawsuit before plaintiffs have exhausted their administrative remedies on a national origin claim, as is required in order to bring an action under Title VII. However, it is not the function of the Court to assess the parties' strategies or decide whether plaintiffs may ultimately bring other, stronger claims. Regardless of plaintiffs' reasons for filing this lawsuit in this form at this time, the complaint must be sustained if it states a valid claim for relief. There is no question that Count I of this complaint states a claim under § 1981.

This Court faced precisely this issue in Rigodon v. Deutsche Bank Sec., Inc., No. 04 Civ. 2548 (GEL), 2004 WL 2471859 (S.D.N.Y. Nov 1, 2004). As the Court pointed out in Rigodon, it is indeed well-established that § 1981 prohibits discrimination on the basis of race, not national

origin.  See Rigodon, 2004 WL 2471859 at *4, citing Runyon v. McCrary, 427 U.S. 160, 168

(1976).  However, in Saint Francis College v. Al-Khazraji, 481 U.S. 604 (1987), the Supreme

Court made clear that construing "race" must be interpreted according to "[t]he understanding of

'race' in the 19th century," when § 1981 was adopted.  Id. at 610.  In Al-Khazraji, while dealing

with a claim of discrimination by a plaintiff of Iraqi origin and Arab ancestry, the Court

concluded that when Congress enacted § 1981, it "intended to protect from discrimination

identifiable classes of persons who are subjected to intentional discrimination solely because of

their ancestry or ethnic characteristics."  Id. at 613.  While the Court emphasized that this was

not the same thing as "national origin," and insisted that to succeed on his claim plaintiff would

have to "prove that he was subjected to intentional discrimination based on the fact that he was

born an Arab, rather than solely on the place or nation of his origin," plaintiff's claim was

permitted to go forward.  Id.

　　　　In Rigodon, the plaintiff, who was of Haitian origin, alleged that he was subject to

discrimination based not on his place of origin, but on his "Haitian ethnicity and ancestry."  2004

WL 2471859, at *1.  This Court noted Justice Brennan's observation in his concurrence in Al-

Khazraji that "the line between discrimination based on 'ancestry or ethnic characteristics,' and

discrimination based on 'place or nation of . . . origin,' is not a bright one."  481 U.S. at 614,

quoting id. at 613.  The Court then concluded that "assuming for these purposes that plaintiff can

prove he was subjected to discrimination of some kind, the question of the nature of the

discrimination is a factual one."  2004 WL 2471859 at *4.  Other courts have reached similar

conclusions.  See MacDissi v. Valmont Indus., 856 F.2d 1054, 1060 (8th Cir. 1988) (finding that

§ 1981 can apply  to persons of Lebanese descent); Aggarwal v. N.Y. City Health & Hosps.

Corp., No. 98 Civ. 5063 (DLC), 2000 WL 172787, at *5 (S.D.N.Y. Feb. 10, 2000) (applying §

1981 to plaintiff of Indian ancestry); Adames v. Mitsubishi Bank, 751 F. Supp. 1548, 1560

(E.D.N.Y. 1990) (holding that § 1981 was appropriate as a basis of a claim by non-Japanese

employees of a Japanese corporation).

       The same is true here.  Defendants do not contest that plaintiffs have adequately alleged

facts that, if proved, would demonstrate that they have been subjected to discrimination.  Instead,

they argue only that it should be inferred that the allegations of discrimination were based on

their non-Japanese national origins, and not on race.  It is up to the fact-finder, however, to

decide what inferences should be drawn regarding the motives of those who engaged in

discrimination.  As defendants point out, the complaint makes no reference to preferential

treatment being given to other Asian employees of Korean, Chinese or other non-Japanese Asian

background, but neither does it contain any allegation suggesting that such non-Japanese Asian

employees (if, indeed, there are any) are subjected to the same discriminatory treatment as non-

Asian employees.  If non-Asian employees are disfavored vis-à-vis Japanese/Asian employees, a

reasonable fact-finder could conclude that the basis of the discrimination was racial or ethnic

rather than simply based on place of origin.  Plaintiffs, indeed, allege that such was the case.

This allegation relating to the motivations of their employer's agents concerns a matter of fact.  It

must be taken as true for purposes of this motion, at least where the claim is not merely

conclusory, but is backed by specific factual allegations that would permit a reasonable fact-

finder to draw such an inference.[1]  Perhaps a jury will conclude that any discrimination suffered

---

[1] Courts have reached divergent conclusions in assessing whether particular complaints of discrimination by Japanese companies involve claims of national origin discrimination or racial/ethnic discrimination.  Compare Avigliano v. Sumitomo Shoji Am., Inc., 473 F. Supp.

by plaintiffs was because they were American and Canadian, rather than Japanese, and not because of their white "race," but that is a matter for trial. The complaint clearly claims that the discrimination was based on race, and therefore states a claim under § 1981.

## II.    Retaliation

In Count II, plaintiffs claim that defendants retaliated against them for filing complaints about the discrimination they suffered. Defendants argue that plaintiffs fail to state a claim under § 1981. Once again, defendants do not argue that plaintiffs have failed to allege facts warranting a conclusion that they suffered adverse treatment and that such treatment was based on their complaints of discrimination. Rather, by parsing the complaint closely, defendants argue that plaintiffs allege only that they were targeted for complaining of unlawful conduct in general, and not specifically of racial discrimination. This motion will also be denied.

Defendants correctly state the governing legal principle. Because § 1981 is concerned only with discrimination on the basis of race, its implicit prohibition of retaliation against those who complain of discrimination is similarly limited to complaints of *racial* discrimination. "[T]o be actionable under § 1981, the retaliation must have been in response to the claimant's assertion

---

506, 514 (S.D.N.Y. 1979) (dismissing § 1981 claim by non-Japanese secretaries against Japanese employer) and Porto v. Canon, USA., Inc., No. 81 C 1305, 1981 WL 381, at *8 (N.D. Ill. Sept. 9, 1981) (finding that complaint that plaintiff was discriminated against because he was not Japanese focused on national origin, not race, and dismissing § 1981 claim but not Title VII claim) with Adames v. Mitsubishi Bank, Ltd., 751 F. Supp. 1548, 1560 (E.D.N.Y. 1990) (stating that "[t]he line between national origin discrimination and racial discrimination is an extremely difficult one to trace" and permitting a § 1981 claim by non-Asian employees of Japanese company); Bullard v. Omi Georgia, Inc., 640 F. 2d 632 (5th Cir. 1981) (finding claim by black and white employees against Asian/Korean employer to state a claim under § 1981); and Spiess v. C. Itoh & Co., 408 F. Supp. 916 (S.D. Tex. 1976) (finding that white citizens of non-Japanese origin had standing to bring § 1981 claim). To the extent that these decisions cannot be reconciled based on the particular allegations in each case, this Court finds the reasoning in the latter set of cases more persuasive, for the reasons stated in the text.

of rights that were protected by § 1981." Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 693 (2d Cir. 1998). *A fortiori*, retaliation for complaints of illegal conduct having nothing to do with employment discrimination does not violate § 1981.

It is true, moreover, that plaintiffs' complaint, which appears to have been drafted with a press release in mind, is filled with allegations of illegality and misfeasance of all sorts by Marubeni, and portrays the plaintiffs as whistle-blowers who were targeted for mistreatment because of their "repeated complaints of discrimination, financial fraud and malfeasance, criminal misconduct, violations [of] immigration laws, and other wrongdoing" at Marubeni. (Compl. ¶ 125.) Nevertheless, all that plaintiffs must do to state a claim under § 1981 is to allege that they were retaliated against for complaining of racial discrimination. Though the complaint here, in its eagerness to tar defendants with all sorts of accusations, recites a plethora of reasons why adverse actions were taken against plaintiffs, one of those reasons is clearly their charges of "discrimination." While the complaint could certainly be clearer on the point, the complaint is reasonably read to mean that the discrimination in question consisted of, or at least included, the alleged racial discrimination that forms the basis of Count I.[2]

---

[2] Under a "mixed-motive" framework, the Supreme Court has determined that when a plaintiff in an employment discrimination case demonstrates that she has been discriminated against, based on an illegal invidious reason, a defendant can avoid liability if it meets its burden in demonstrating that it would have made the same decision had it not taken the invidious reason into account. Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). While the plaintiff in Price Waterhouse v. Hopkins alleged gender discrimination pursuant to Title VII, and this "mixed motive" principle has not explicitly been extended to claims brought under § 1981, plaintiffs' claims may ultimately be difficult to prove, in light of their own allegations that defendants were motivated to retaliate against plaintiffs for a variety of reasons, many of which, however unpleasant, are not illegal. Nevertheless, the Court need not decide these issues here, as plaintiffs have sufficiently alleged facts to state a claim under § 1981.

Accordingly, the defendants' motion to dismiss is denied as to Count II.[3]

III.   Defamation

Count IX of the complaint charges all but one of the defendants with defamation under New York State law, based on an e-mail sent to Marubeni employees in response to plaintiffs' filing of this action.  Defendants move to dismiss this claim on the ground that N.Y. Civ. Rts. L. § 74 provides "absolute protection for such out-of-court communications regarding issues in litigation"  (D. Br. 17; internal quotation marks omitted), and on other grounds discussed below.

The pertinent passage of the e-mail, as set forth in the complaint, reads as follows:

> We believe that the two individuals have advanced their allegations as part of an effort to collect an unbelievably large amount of money of more than $4.5 million each, by way of severance agreements to which they are absolutely not entitled.  They claim to rely on documents allegedly signed by executives of the company who have totally denied ever signing or even seeing the documents in question. The two individuals have refused to make the original of these available for examination by a handwriting expert; and a preliminary investigation conducted by the Company has uncovered substantial evidence that the alleged severance letters are not genuine.  When the Company made it clear that it would not pay the outrageous amounts of money demanded, the two individuals filed the litigation, claiming that they had been acting only for the purpose of improving the company.

(Compl. ¶ 132.)  Plaintiffs allege that "[t]hese defamatory statements . . . falsely and maliciously accuse [them] of engaging in fraud, forgery, and extortion and other criminal acts," and "also falsely and maliciously accuse [them] of filing this Complaint only after demanding payment of outrageous amounts of money and [Marubeni] refused such a demand."  (Id. ¶¶ 133, 134; see

_____

[3] Since the federal claims in Counts I and II survive, plaintiffs' argument that Counts III-X, which are based on state law, should be dismissed for lack of subject matter jurisdiction is moot.

also ¶¶ 182, 184, 186.)

The complaint does not identify any specific factual assertion in the e-mail as literally

false. The complaint could be interpreted as asserting the falsity of each and every statement in

that passage. Alternatively, it could be read as denying only the implied assertions that the

plaintiffs engaged in "fraud, forgery, and extortion," and that they did not file the complaint until

after a demand for money had been refused by Marubeni. A variety of obstacles to a successful

claim on either theory are apparent, but few of these can be appropriately addressed on a motion

to dismiss. Defendants raise three grounds for dismissing the complaint. Although none of

defendants' arguments justify dismissing the complaint at this stage of the litigation, at least one

is worthy of extended discussion.

A.    Civil Rights Law Section 74

Defendants first argue that the e-mail is protected by absolute privilege under § 74 of

New York's Civil Rights Law, and that consequently the complaint fails to state a viable claim of

defamation under New York law. A literal reading of the statute cited provides scant support for

defendants' argument.

Section 74 provides, "A civil action cannot be maintained against any person, firm or

corporation, for the publication of a fair and true report of any . . . official proceeding." N.Y.

Civ. Rts. L. § 74. Assuming that plaintiffs' complaint can be construed as part of an "official

proceeding," the e-mail goes well beyond describing the complaint, or anything else that

occurred in court. The assertion, for example, that the persons who allegedly signed certain

documents "have totally denied ever signing or even seeing the documents in question,"

describes nothing that occurred in court or has been asserted in a pleading, but rather reports

8

communications that were allegedly made in private conversations. Similarly, plaintiffs' alleged

refusal to make the documents available for testing, and any alleged demands made by the

plaintiffs and refused by Marubeni, by the plain language of the e-mail are alleged to have taken

place before a complaint was even filed or any other "official proceeding" had occurred.

Moreover, there is plainly a controversy between the parties as to whether the e-mail's account is

a "fair and true report" of anything whatsoever; defendants claim that it is, while plaintiffs

describe it as false and defamatory.

Defendants argue, however, that the New York courts have given a broader reading to §

74, and that the statute as interpreted absolutely privileges any statement, in or out of court, that

"relates to pending or contemplated litigation." (D. Br. 18, quoting Caplan v. Winslett, 637

N.Y.S.2d 967, 970 (1st Dep't 1996)). A review of the precedents interpreting § 74 suggests that

the case law is considerably more complex than either party asserts.

The leading pronouncement about § 74 by New York's highest court does not support

defendants' sweeping view of the statute. In Williams v. Williams, 23 N.Y.2d 592 (1969), an

employee sued officers of his former employer for libel after the employer sued the employee for

misappropriation of trade secrets, and the defendant officers circulated the complaint to others in

the industry.[4] The defendants in Williams, like defendants here, argued that they were protected

by § 74 because their communication had fairly reported the allegations made in a judicial

---

[4] In their reply brief, defendants chide plaintiffs because Williams is "the *only* authority
[p]laintiffs cite in their attempt to avoid § 74." (Reply Br. 8.) Defendants are certainly correct
that a full picture of the precedent regarding § 74 requires analysis of subsequent lower-court
cases. A more pertinent question, however, is why *defendants'* initial brief entirely ignored
Williams, a case decided by New York's highest court (unlike any of the cases relied on by
defendants) that arose on facts that have a close resemblance to those here, and that is
prominently cited in cases on which defendants did choose to rely.

proceeding, but the Court of Appeals ruled otherwise.  According to the Court, the statute (which originally protected only newspapers and their staffs) was enacted to protect "reports of judicial proceedings which are made in the public interest," id. at 599, in order to support the public nature of judicial proceedings by conveying information to citizens who could not attend in person.  Id. at 597.  The Court rejected the defendants' argument, finding that the legislature could not have been so "malicious[]" at to protect a defendant who made scurrilous false accusations in court, where they would be protected by common-law privilege, only so as to be able to repeat them out of court, under the purported protection of § 74.  "[I]t was never the intention of the Legislature in enacting section 74 to allow 'any person' to maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute."  Id. at 599.

The Court of Appeals has further explained that § 74 itself, which is the descendant of a long series of statutes formerly codified in the Judiciary Law and the Civil Practice Act, "was not designed to effect any change in the scope of the privilege as it had been previously applied to judicial proceedings," but simply to extend the common-law privilege for fair reporting of judicial proceedings to cover certain administrative and other quasi-judicial proceedings.  Shiles v. News Syndicate Co., 27 N.Y.2d 9, 17 (1970).  The nature of the common-law privileges attaching to statements related to judicial proceedings reveals that there are two separate privileges, which must be kept separate.  Judge Burke's concurring opinion in Williams, which was itself joined by a majority of the Court, see 23 N.Y.2d at 610, clarifies the distinction.

At common law, as adopted in New York as early as 1850, "words spoken or written in a judicial proceeding by a party to that proceeding could not provide the basis of a cause of action

10

for libel." <u>Williams</u>, 23 N.Y. 2d at 600, citing <u>Garr v. Selden</u>, 4 N.Y. 91 (1850).  This privilege

was absolute, and thus, "a party had an absolute right to say anything in a judicial proceeding,

without fear of committing a libel, in accord with a general policy of encouraging the use of the

courts." <u>Id</u>.

      In contrast, the statute which was first adopted in 1854 that evolved into § 74 "was not

intended to, and did not, alter the common-law protection afforded litigants.  Rather, the

enactment recognized another common-law rule which created a qualified privilege – rendered

inapplicable by showing actual malice – for a fair and true report of a judicial proceeding by a

[journalist]." <u>Id</u>. at 601.  In 1930, this privilege also became absolute, and in 1940 it was

extended to "all persons." <u>Id</u>.  Judge Burke concluded that while the 1940 legislation recognized

that "all citizens," and not just professional journalists, had the right "freely to publish fair and

true reports of judicial proceedings," <u>id</u>. at 602, citing <u>Lewis v. Chemical Found. Inc.</u>, 262 N.Y.

489, 490 (1933), it did not permit the kind of abuse presented in <u>Williams</u>.  "The purpose of the

1940 amendment . . . was to extend to all disinterested persons the privilege then possessed by

the press – to publish true and fair reports of judicial proceedings without fear of liability."

<u>Williams</u>, 23 N.Y. 2d at 603.  For litigants, the traditional privilege to speak or write during the

court proceedings was sufficient protection.

      The leading treatise on defamation reaches similar conclusions.  Parties to litigation have

an "absolute privilege . . . for defamatory statements made prior to, in the institution of, or during

the course of, a proceeding."  Robert D. Sack, <u>Sack on Defamation: Libel, Slander, and Related</u>

<u>Problems</u> ("Sack on Defamation"), § 8.2.1.4 at 8-14 (2004).  However, while this privilege

covers communications adjunct or preparatory to legal proceedings such as communications to

11

an attorney, id., "during the course of the proceeding" does *not* mean, as defendants appear to suggest, that the privilege extends to any statement made in any forum while a proceeding is pending that relates to the same subject matter as the proceeding.  "The privilege is usually understood as not applying . . . to out-of-court statements made to persons not related to the litigation."  Rodney Smolla, Law of Defamation, §8:9 at 8-12.4 (2d ed. 2005).  See Sack on Defamation, § 8.2.1 at 8-19 ("[S]tatements made by parties to litigation to the public, during the course of press conferences, for example, . . . are not privileged."); see also Schulman v. Anderson Russell Kill & Olick, 458 N.Y.S.2d 448, 453 (Sup. Ct. 1982) (finding a law firm not entitled to absolute privilege with respect to a letter sent to persons unconnected to the lawsuit).

The privilege for in-court statements is considerably broader in scope than that for out-of-court reports relating to the proceedings.  The former are covered as long as the inference has some bearing on the litigation.  Restatement (Second) of Torts § 587 (1977).  Out-of-court statements such as press releases, which are not covered by the litigants' privilege, are privileged only to the extent that they represent fair and true reports of what occurred in the proceeding (subject to the Williams exception for a party's out-of-court repetition of a maliciously false statement in a pleading).

While the trend of lower court authorities goes beyond the understanding of these privileges adopted in Williams, many of the cases cited by defendants do not go as far as defendants seem to believe, when considered in light of their facts.[5]  On the other hand, several

---

[5] In The Savage is Loose Co. v. United Artists Theater Circuit, Inc., 413 F. Supp. 555, 560-61 (S.D.N.Y. 1976), Judge Lasker held that an attorney was protected by § 74 when he repeated the substance of his client's complaint to a reporter, who had sought him out for an interview and who already had a copy of the complaint that had been publicly filed.  McNally v. Yarnall, 764 F. Supp. 853 (S.D.N.Y. 1991), is similar.  The court in Caplan v. Winslett, 637

lower courts have read <u>Williams</u> itself as more closely limited to its facts.  In <u>Williams</u>, the plaintiff alleged a deliberate institution of baseless litigation for the precise purpose of fabricating a reporting privilege.  Absent those specific circumstances, several New York appellate cases seem to have found that the reporting and litigation privilege converge to create an absolute privilege for out-of-court assertions, when made to interested parties, and that fairly reflect a party's in-court litigation position.

Most similar to the present case is <u>Hughes Training Inc. v. Pegasus Real-Time Inc.</u>, 680 N.Y.S.2d 721 (3d Dep't 1998), a suit for the misappropriation of trade secrets, where plaintiff posted a memorandum outlining the litigation on its internal bulletin boards (an old-fashioned version of the e-mail to employees here).  The memorandum "accurately reflect[ed] the substance of the lawsuit and does not suggest more egregious conduct than that recounted in the complaint, nor [did] it present defendants' purported wrongdoing as established fact rather than allegation." <u>Id</u>. at 723.  Distinguishing <u>Williams</u> by the absence of evidence that the action was started in bad faith, the Court affirmed dismissal on summary judgment of defendants' counterclaim for defamation.  <u>Id</u>.  <u>Hudson v. Goldman Sachs & Co., Inc.</u>, 757 N.Y.S.2d 541 (1st Dep't 2003), is also pertinent.  There, the court affirmed dismissal of a defamation complaint based on

---

N.Y.S.2d 967 (1st Dep't 1996), held that the litigation privilege protected an attorney's statement to an opposing attorney during settlement negotiations.  <u>Id</u>. at 969-70. Although the court spoke broadly of the protection of "out-of-court communication" relating to litigation, the case involved statements made in settlement discussions directly adjunct to the legal proceedings.  In <u>O'Brien v. Alexander</u>, 898 F. Supp. 162 (S.D.N.Y. 1995), most of the allegedly defamatory statements were made in the course of actual court proceedings.  <u>Id</u>. at 171-72, 172 n.14.  Those that were not were made to persons with knowledge of the case whose testimony was being solicited and thus were made by attorneys in the course of preparing the case for trial.  <u>Id</u>. at 170-71, 171 n.13. <u>Chimarev v. TD Waterhouse Investor Servs., Inc.</u>, 233 F. Supp. 2d 615, 618 (S.D.N.Y. 2002), which rejected a libel claim based on statements about the plaintiff employee's competence made in court proceedings in defense of an employment discrimination suit, is even less apposite.

newspaper statements made by a party *before* that party had taken a similar position in court documents.  The court first noted that it had earlier held that dismissal of the complaint was "premature" before the party had actually taken a position in court.  Hudson, 757 N.Y.S.2d at 542, citing Hudson v. Goldman Sachs Co., 725 N.Y.S.2d 318, 320 (1st Dep't 2001).  It then determined that once the party had in fact taken the position stated to the press, the fact that the publication had preceded the pleading was no barrier to application of § 74, concluding, "Nothing about Civil Rights Law § 74 suggests that a person served with a summons and complaint should not feel free and safe to announce its position, and otherwise make its first response to the allegations against it, in a forum other than court."  Hudson, 757 N.Y.S.2d at 542.

These cases suggest a broader application, either of § 74 or of the litigants' privilege, that would permit a finding of privilege in defendants' statements.  However, neither case suggests that the complaint here may be dismissed for failure to state a claim.  Like the defendants in Hudson at the time of the first motion to dismiss, defendants here have not yet "taken a position, not in an unsworn brief but in something more formal and binding such as a pleading," corresponding to the position taken in the e-mail.  Hudson, 757 N.Y.S.2d at 542.  Nor do we have a fully-developed summary judgment record, as there was in Hughes Training, about whether the allegations made in the e-mail "suggest more egregious conduct than that recounted in" defendants' pleading.  Hughes Training, 680 N.Y.S.2d at 723.  Moreover, at this stage of the proceedings, it cannot be said that defendants' allegations were made in bad faith, as in Williams.

Under the circumstances, the Court cannot determine as a matter of law, based solely on the plaintiffs' pleading, that plaintiffs are unable to state a claim on which relief can be granted.  In light of the analysis set forth in Williams, it cannot be so flatly asserted, as defendants would

have it, that any out-of-court statement broadly pertinent to on-going litigation is absolutely

privileged either under the litigation or reporting privileges.  Neither, however, can it be said, as

plaintiffs argue, that <u>Williams</u> simply disposes of defendants' argument, since there is a fair

degree of authority for interpreting the privilege more broadly, in effect distinguishing <u>Williams</u>

on its particular facts.  Development of a factual record, and further developments in this lawsuit,

may well permit the Court to conclude that the e-mail was absolutely privileged, but the

applicability of the privilege cannot be ascertained solely from the facts alleged in plaintiffs'

complaint.

      B.     <u>Expression of Opinion</u>

"In all defamation cases, the threshold issue which must be determined, as a matter of

law, is whether the complained of statements constitute fact or opinion.  If they fall within the

ambit of 'pure opinion,' then even if false and libelous, . . . such statements are safeguarded and

may not serve as the basis for an action in defamation."  <u>Parks v. Steinbrenner</u>, 520 N.Y.S.2d

374, 375 (1st Dep't 1987), citing <u>Steinhilber v. Alphonse</u>, 68 N.Y.2d 283, 289 (1986).

Defendants argue that the first and last sentences of the e-mail passage are mere expressions of

opinion, because they are expressly presented as matters of opinion.

The sentences in question cannot be defined as a matter of law as mere expressions of

opinion.  Contrary to defendants' argument, use of words such as "[w]e believe" do not

automatically insulate an assertion from a defamation suit.  (Compl. § 132.)  That is because

"[w]hen . . . the statement of opinion implies that it is based upon facts which justify the opinion

but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable."

<u>Steinhilber</u>, 68 N.Y.2d at 289.  "The essential task is to decide whether the words complained of,

considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." Id. at 290.

Here, the first sentence of the e-mail, while couched in the language of "belie[f]," clearly makes an implied assertion of fact – that the plaintiffs' lawsuit is part of an effort to collect "more than $4.5 million each, by way of severance agreements to which they are absolutely not entitled."[6] (Compl. ¶ 132.) The sentence cannot be separated from the two sentences that follow, which explains that plaintiffs are "absolutely not entitled" to the money because they rely on documents that defendants charge are fabricated.[7] Similarly, the last sentence expressly charges that the plaintiffs brought their suit after Marubeni refused to pay money that was demanded – under false pretenses, as suggested in the previous sentences – and implicitly charges that their "claim[s] that they had been acting only for the purpose of improving the company" are falsehoods.

A reasonable person would surely understand that the e-mail reflects Marubeni's position on the litigation, and a skeptic might well take it with a grain of salt. Nevertheless, to say that a

---

[6] Defendants rely on the use of language like an "unbelievably large amount of money," elided in the quotation in the text above, as indicating that the sentence is clearly one of opinion. (D. Br. 20.) Whether the sum of money is "unbelievabl[e]" is, one assumes, a matter of opinion. However, the sting of the sentence is not in the characterization, but in the flat factual statement that plaintiffs seek a specific sum of money, $4.5 million, to which they are "absolutely not entitled." This is not a matter of opinion, but a factual claim about plaintiffs' demands and motives.

[7] The e-mail does not directly state that plaintiffs are guilty of forgery, only that the documents on which they rely are not genuine. It is a question of fact for the jury whether a reasonable reader would construe the e-mail as charging that the plaintiffs are guilty of that crime.

statement represents one side's litigation position is not to say that it is a mere expression of opinion. "We believe the lawsuit will prove unfounded" is an expression of opinion; "our position is that the plaintiff is a forger" is not. It will be for the factfinder to decide whether the passage conveys the defamatory message plaintiffs ascribe to it, but the message plaintiffs claim is there is one of fact, not opinion.

C.    Qualified Privilege

Under New York law, "[t]here exists a qualified privilege where the communication is made to persons who have some common interest in the subject matter." Foster v. Churchill, 87 N.Y.2d 744, 751 (1996). Defendants assert that on the facts alleged, the e-mail is presumptively subject to such a privilege, and that the complaint does not allege sufficient facts to overcome the privilege.

An e-mail to all employees of a company regarding a lawsuit brought by certain senior executives could qualify as a "communication . . . made to persons who have some common interest in the subject matter."[8] See Dillon v. City of New York, 704 N.Y.S.2d 1, 7 (1st Dep't 1999) ("[T]o the extent that memoranda are prepared for internal use in connection with an

_____

[8] Plaintiffs argue that "it is simply ridiculous for Defendants to contend that every single employee at [Marubeni], from the highest-ranking official to the lowest-level employee, had an interest or a duty to receive the e-mail." (P. Br. 27.) Few of the cases on which defendants rely involve a communication so widely broadcast. Most involve communication merely to small groups of employees who need to know facts about fellow-employees, for example in order to make personnel decisions. It appears reasonable, however, to conclude that if high-level executives of a company accuse it of extensive misconduct, including discrimination against its employees, the employer and the employees will share a common interest in learning about the truth of those accusations. Nevertheless, a fuller factual record concerning such facts as the number of employees to whom the e-mail was sent and the extent to which plaintiffs' allegations were circulated within the company will permit a more authoritative conclusion as to whether such a common interest existed, whether on summary judgment or at trial.

employee review, or are placed in a personnel file, or statements are made about an employee in an employment context, . . . they are qualifiedly privileged as having been made by one person to another upon a subject in which they have a common interest.").  However, the privilege may be defeated "if plaintiff can demonstrate that the defendant spoke with 'malice.'"  Liberman v. Gelstein, 80 N.Y.2d 429, 437 (1992).  Such malice includes not merely "spite or ill will," but also publication "with [a] high degree of awareness of [the publication's] probable falsity" or while the "defendant in fact entertained serious doubts as to the truth of the publication."  Id. at 438 (internal citations omitted).  Here, the e-mail can reasonably be read to charge that the severance agreements on which plaintiffs rely are fabricated, while the complaint alleges that defendant Saito, Marubeni's Chief Financial and Administrative Officer, had expressly acknowledged their genuineness.  (Compl. ¶¶ 39-40.)  Plaintiffs expressly allege that the statements in the e-mail were made "with knowledge of their falsity and/or with reckless disregard for [their] truth or falsity" (Compl. ¶ 132, 186), and they support that charge with at least some facts indicating that, if their version of the facts is correct, high-level officials of Marubeni must have known the true facts, including the allegation that at least one such official made statements to them inconsistent with the version in the e-mail.  Nothing more is required at this stage of litigation.

D.    Specificity

Finally, Marubeni claims that the complaint's "blunderbuss" allegation that defendants "have made, and continue to make, these and other similarly false and derogatory statements about Plaintiffs" is insufficiently specific to support a claim for defamation.  (D. Br. 22, quoting Compl. ¶ 137.)  Plaintiffs have not attempted to argue that the complaint states a claim for

18

defamation based on any statement other than the challenged e-mail.  (See P. Br. 28-30.)

Accordingly, the Court construes the defamation complaint as being based solely on that

communication.  As the complaint, so construed, states a claim for relief, defendants' motion to

dismiss Count IX must be denied.

## IV.    The Individual Defendants

In addition to the motions above, which are made by both Marubeni and the individual

defendants, particular individual defendants move to dismiss certain counts of the complaint as

to them.  These motions will be granted in part and denied in part.

### A.      Sakamoto and Saito

Defendants Kazuhiko Sakamoto and Masami Saito move to dismiss the defamation count

(Count IX) as to them, on the ground that the complaint alleges that the allegedly defamatory e-

mail was sent by another defendant, Shigemasa Sonobe, and not by them.  The motion will be

granted.

Defendants argue that plaintiffs must provide "sufficient notice of the defamatory

statements in order to allow the defendant to defend himself," and that plaintiffs fail to identify

defamatory statements made by them.  (Indiv. D. Br. 4, citing Odom v. Columbia Univ., 906 F.

Supp. 188, 196-97 (S.D.N.Y. 1995.)  This argument is not on point:  the complaint is quite

specific about the language from the e-mail in question that plaintiffs claim is defamatory.  The

problem, rather, is that the complaint is totally vague about what role Sakamoto and Saito are

supposed to have played in the uttering of the e-mail.

Sakamoto and Saito assert that since the e-mail was sent by Sonobe, they cannot be held

liable in defamation.  Neither side cites any authority clearly upholding or rejecting a defamation

19

claim based on an aiding and abetting theory. Nevertheless, the fact that the e-mail was sent

from Sonobe's account should not insulate from liability others who directly participated in the

decision to send it. A defamatory statement is uttered not merely by the person from whose e-

mail account it is sent, but by anyone who participates in its publication, demonstrated by the

many defamation cases brought against reporters, editors and publishers of a defamatory

newspaper. See Sack on Defamation § 7.1 ("[O]ne who republishes a defamatory statement

[originally made by another] 'adopts' it as his own and is liable in equal measure.").

Nevertheless, the only allegation in the complaint bearing on the role of Sakamoto and

Saito is that the e-mail was sent with their "knowledge, permission and/or authorization."

(Compl. ¶ 136.) Even assuming that a conclusory allegation of participation, without any factual

detail, would satisfy the notice pleading standard of Fed. R. Civ. P. 8(a), "and/or authorization"

will not do. The complaint essentially alleges that these defendants may have had no more than

knowledge that someone was sending an e-mail. It does not assert even that they knew it was

false, or that they did anything to further the defamation. Count IX must therefore be dismissed

as to Sakamoto and Saito for failure to state a claim as to them.[9]

---

[9] Sakamoto and Saito are also named as defendants in Counts I through VIII, but do not challenge the adequacy of the allegations of those counts to state a claim against them on any basis specific to them. Since the motions of all defendants to dismiss those counts have been denied for the reasons stated above, these claims remain pending as to Sakamoto and Saito.

The intended application of Count X to the individual defendants is unclear. Count X seeks a declaratory judgment that "Defendants' conduct constitutes a constructive discharge and/or 'good cause for them to terminate their employment at [Marubeni], thereby entitling them to the severance payments and other benefits set forth in the Severance Agreements." (Compl. ¶ 203.) However, since the individual defendants are not parties to the Severance Agreements, which is alleged to have been made with Marubeni (Compl. ¶¶ 34, 36), both the gravamen of the claim, which essentially is based on breach of contract, and the practical effect of the relief sought, run only against Marubeni.

B.     Sonobe

Defendant Sonobe is charged in the retaliation (Counts II, IV, and VII) and defamation

(Count IX) claims, and he does not challenge those counts.  He does move, however, to dismiss

the charges against him for aiding and abetting discrimination against the plaintiffs in violation

of New York State and City law (Counts V and VIII).[10]  The motion will be granted.

Except with respect to the allegedly defamatory e-mail, which is alleged to have been sent

by Sonobe, the complaint is largely devoid of reference to Sonobe's actions.  Although several

introductory paragraphs allege generally that "Defendants" engaged in discrimination against

plaintiffs (see, e.g., Compl. ¶¶ 1, 4, 8), the paragraph introducing Sonobe specifically charges that

he "participated directly in the unlawful retaliatory conduct against Plaintiffs," as well is in

unspecified other "unlawful and/or improper acts about which Plaintiffs repeatedly complained."

---

[10] Count I of the complaint conspicuously fails to charge Sonobe with discrimination in
violation of § 1981.  (Compl. ¶ 144.)  Counts III and VI similarly fail to name him in the charges
of discrimination in violation of State and City law (Compl. ¶¶ 154, 166), though this is of less
moment since he is charged with aiding and abetting these violations in V and VIII.
Unaccountably, plaintiffs assert in their brief in opposition to the motions to dismiss that Counts
I, III and VI are pressed against "all Defendants," and that "[a]lthough Defendant Sonobe is not
specifically mentioned by name in those claims, he is sufficiently put on notice as an executive of
Defendant [Marubeni] that he is alleged to have discriminated [against] and harassed Plaintiffs"
on the basis of race.  (P. Br. 30-31.)  This is simply false.  Even the minimal requirements of
notice pleading under the federal rules require that a party be put on actual notice that a claim is
made against *him*.  Suing a corporation does *not* put all its executives on notice that they are
alleged to have violated the law as individuals.  The pattern of charging in the complaint is
crystal clear: Counts V, VIII and IX specifically name each of the four individual defendants;
Counts II, IV and VII name no one, but refer to "Defendants" generally; and Count I specifically
names only defendants Sakamoto, Saito and Van Dorn.  Under these circumstances, no
reasonable lawyer or litigant would be on notice that Count I applies to Sonobe.
     Nevertheless, this omission is essentially technical.  The same substantive reasoning set
forth in the text with respect to the state law discrimination claims would equally govern a claim
under § 1981.  If the factual allegations set forth a valid claim of discrimination against Sonobe,
plaintiffs could amend the complaint to name him in Count I; if they do not, the state counts
would be dismissed as to Sonobe and an amendment of Count I to name him would be futile.

(Compl. ¶ 20.)  This is in conspicuous contrast with the paragraphs identifying Sakamoto, Saito and Van Dorn, who are each specifically described as having "participated directly in the unlawful *discriminatory* and retaliatory conduct against Plaintiffs," as well as in other purported "transgressions."  (Compl. ¶¶ 17, 18, 19; emphasis added.)  Moreover, the complaint repeatedly charges that plaintiffs were mistreated by "senior Asian/Japanese executives, including Defendants Sakamoto and Saito."  (Compl. ¶ 43; see also ¶ 50.)  While the complaint is replete with instances of allegedly racist comments or other misconduct attributed to specific Marubeni employees named and unnamed, including Sakamoto, Saito and Van Dorn, *none* of these actions are attributed to Sonobe.  The paragraphs in the complaint dealing with alleged retaliation frequently refer generally to "Defendants" as having engaged in certain specific actions (see, e.g., Compl. ¶¶ 121, 122, 126-130.)  In sharp contrast, even that vague term, which could be taken as including Sonobe, only appears once in the sections dealing with discriminatory treatment, in a conclusory assertion that "Defendants have discriminated against Plaintiffs in the administration of employee benefits and perquisites."  (Id. ¶ 44.)  Nothing is further specified.

Even under the liberal standard of Fed. R. Civ. P. 8(a), as interpreted in Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), plaintiffs must at a minimum allege some facts that give rise to an inference that the named defendant participated in some way in acts of discrimination against them.  A complaint that is "devoid of any assertions of fact" is insufficient.  Thomas v. Westchester County Health Care Corp., 232 F. Supp. 2d 273, 278 (S.D.N.Y. 2002).  Here, plaintiffs do allege concrete acts of discrimination, some of which are particularly tied to certain defendants, but that is not enough.  Under § 1981, in order to hold individual defendants liable, plaintiffs must show "some affirmative link to causally connect [their] act[s] with the

discriminatory action." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000). The same is true under New York State and City law. See Lee v. Overseas Shipholding Group, Inc., No. 00 Civ. 9682 (DLC), 2002 WL 1929490, at *7 (S.D.N.Y. Aug. 21, 2002); Stallings v. U.S. Elec. Inc., 707 N.Y.S.2d 9, 9 (1st Dep't 2000). This rule does not change because plaintiffs assert liability under an aiding and abetting theory – aiding and abetting requires that a person commit some act that facilitates illegal conduct.

"[I]f the plaintiff fails to plead any facts suggesting that a defendant displayed any intent to discriminate or was in an way involved in the alleged discriminatory scheme, the defendant may not be held liable." Lewis v. Triborough Bridge & Tunnel Auth., 77 F. Supp. 2d 376, 381 (S.D.N.Y. 1999). Since plaintiffs have made "no allegation that [Sonobe] personally engaged in any discriminatory behavior," Hirsch v. Columbia Univ., College of Physicians & Surgeons, 293 F. Supp. 2d 372, 378 (S.D.N.Y. ), Counts V and VIII must be dismissed as to him.

C.      Van Dorn

Defendant Joe Van Dorn, unlike Sonobe, is charged in all counts of the complaint except the defamation count. He moves to dismiss the discrimination counts (Counts I, III, V, VI and VIII) for failure to allege his participation in specific acts of discrimination against plaintiffs, and the retaliation counts (Counts II, IV and VII), based on his assertion that he was no longer employed by Marubeni during the period in which the retaliation is alleged to have occurred. The motion will be denied with respect to the discrimination counts, and granted with respect to the retaliation counts.

With respect to the discrimination counts, the governing law is set forth in the preceding section. Van Dorn somewhat ingenuously points to portions of the complaints that show him

engaging in conduct that *favored* the plaintiffs. (Indiv. D. Br. 9.) It is true, moreover, that while the complaint depicts Van Dorn as making any number of crudely racist and sexist remarks directed at Jews, blacks, Hispanics and women (Compl. ¶¶ 71-79), it is distinctly short on specific factual allegations of actual mistreatment of the plaintiffs themselves, who are apparently non-Hispanic, non-Jewish male Caucasians, or of directing any vituperation at groups to which plaintiffs belonged.

Nevertheless, the complaint does allege in general terms that Van Dorn "participated directly in the discriminatory . . . conduct against Plaintiffs" (id. ¶ 19), an allegation not made as to Sonobe. Nor can it be said of Van Dorn, as it can of Sonobe, that the complaint fails to plead facts "such as discriminatory comments indicating . . . bias." Thomas, 232 F. Supp. 2d at 278. The complaint alleges a host of such comments. These assertions give color to the conclusory allegation that Van Dorn participated in the discrimination charged, and that he was one of the "Defendants" who allegedly discriminated against plaintiffs with respect to job benefits and perquisites. (Compl. ¶ 44.) Given the minimal requirements for pleading a cause of action for discrimination, see Swierkiewicz, 534 U.S. at 510-11, the complaint suffices as to Van Dorn, if only barely.

As to the retaliation claims, Van Dorn points out that he retired in 2002, and that plaintiffs' complaints that led to the alleged retaliation were not made until late 2003. (Indiv. D. Br. 10.) Putting aside the fact that Van Dorn's retirement is a fact outside the complaint – albeit one that is apparently uncontested – plaintiffs assert in their responsive papers that it was Van Dorn who disavowed the authenticity of the severance agreements, and that this disavowal forms a centerpiece of the retaliation claims. (P. Br. 31-32.) It suffices to say that plaintiffs

24

acknowledge that these assertions are "not expressly set out in the Complaint."[11]  (Id. at 31.)  A

motion to dismiss is directed to the complaint, and not to theories spun out in plaintiffs'

opposition papers. See  Ifill v. UPS, No. 04 Civ. 5963 (LTS)(DFE), 2005 WL 736151, at *4

(S.D.N.Y. Mar. 29, 2005) ("For purposes of the instant motion, the Court considers only the

allegations actually plead[ed].").

Moreover, a retaliation claim in employment law requires a causal connection between

the retaliation and protected activity, and that defendant was aware of the protected activity.

Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004).  It is conceivable that a former officer

of a company or some other person not in its employ could, under some unusual circumstances,

play a role in the company's retaliatory actions against an employee who complains of

discriminatory conduct.  Here, though, plaintiffs do not really allege or argue that Van Dorn

played any role in the alleged decisions of his successors at Marubeni to cut plaintiffs out of

meetings, retard their advancement, or deny them salary increases in retaliation for their

complaints.  Rather, the position advanced in the briefs is that Van Dorn essentially lied about

whether he had signed the Severance Agreements, and that he did so because he was angry at

plaintiffs because they disclosed his participation in discriminatory hiring practices.  Plaintiffs

cite no authority for the proposition that a non-employment-related act (such as lying in order to

disadvantage plaintiffs in a breach of contract action), taken by someone who is no longer in any

employment relation with the plaintiff, who has taken personal offense at the plaintiff for

---

[11] Indeed, the complaint studiously avoids suggesting that Van Dorn has ever disavowed
the Severance Agreements.  Furthermore, the defamation allegations could be taken as asserting
that Sonobe's claim that Marubeni executives had disavowed their purported signatures on the
agreement was a lie.

revealing past acts of discrimination by him, is actionable as retaliation as a matter of state and federal employment law.

In the absence of any concrete allegations attempting to spell out such a theory, or any adequate briefing of the question, the Court declines to speculate about what facts, if any, could be pled to make a former supervisor liable for retaliation. The present complaint fails to allege *any* such facts, and the theory in question is barely a gleam in the eye of the author of plaintiffs' brief. As the complaint stands, Van Dorn is not alleged to have engaged in employment-related retaliation of any sort against the plaintiffs. Accordingly, the retaliation claims must be dismissed as against him.

V.    The Motion to Strike and the Motion for Sanctions

In the depressing manner of a certain kind of uncivil litigation, the parties exchange *ad hominem* charges of litigation abuse. Defendants seek to strike large portions of the complaint, claiming it is based solely on a desire to create hostility toward Marubeni; plaintiffs in turn seek sanctions for what it claims are frivolous motions addressed to its complaint.[12] Neither motion is worth the effort exerted to create it, and the Court will not encourage such tactics.

The motion to strike will be denied. It is true that the complaint includes a lengthy, and somewhat vituperative, account of Marubeni's alleged sins, many of them quite irrelevant to the racial/ethnic discrimination that forms the basis of Counts I and II. Nevertheless, these are not the only claims made by plaintiffs. Indeed, on defendants' own theory of the case, as asserted in the e-mail, the heart of this dispute is not plaintiffs' claim that they were discriminated against,

---

[12] Defendants carry the game one step further, arguing that they should be awarded counsel feels as the putative prevailing party on the sanctions motion. (See D. Sanctions Br. 11.)

but rather, their claim for a declaratory judgment that the company's response to their alleged efforts to reform these supposed abuses constitutes a constructive discharge entitling them to severance payments under their alleged contract.  (Count X.)  The allegations defendants seek to strike are the basis for this count, which defendants have not moved to dismiss.  "Motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute."  Zinaman v. USTS N.Y., Inc., 798 F. Supp. 128, 135 (S.D.N.Y. 1992).  The material in question is not "redundant, immaterial, impertinent, or scandalous," Fed. R. Civ. P. 12(f), and thus, there is no basis for granting the motion.

Plaintiffs, in turn, seek Rule 11 sanctions, arguing that defendants' motion to dismiss is frivolous.  Plaintiffs' motion is expressly predicated on the erroneous notion that this Court's decision is Rigodon is controlling precedent.  It is not.  While it may be predictable that the author of that opinion would reject defendants' motion, Rigodon is a district court opinion, and is not a binding precedent.  Defendants are perfectly entitled to challenge its correctness, in order to preserve their apparent disagreement with its conclusion for appellate review.  In this Opinion, as in Rigodon itself, this Court has noted Justice Brennan's wise observation that "the line between discrimination based on ancestry or ethnic characteristics, and discrimination based on place or nation of origin, is not a bright one."  Al-Khazraji, 481 U.S. at 614 (concurring opinion; internal quotation marks and ellipsis omitted).  Defendants were entitled to argue that plaintiffs' complaint alleges facts that fall on the latter side of the line.[13]  There is thus no basis for Rule 11

---

[13] Although defendants' failure even to cite Rigodon, or attempt to distinguish it, in their main brief is not a tribute to their research or advocacy skills, sloppy research, or even deliberate suppression of adverse authority, is not a basis for Rule 11 sanctions if the position being taken is not frivolous.

sanctions.[14]

It is hoped that the parties will conduct the remainder of this litigation by addressing the merits, and avoid collateral posturing that fails to advance resolution of the claims being made.

## CONCLUSION

Defendants' motion to dismiss Counts I, II, and IX in their entirety for failure to state a claim is denied, as is their motion to dismiss Counts III through X for lack of subject matter jurisdiction. The motion of defendants Sakamoto and Saito to dismiss Count IX as to them is granted. Defendant Sonobe's motion to dismiss Counts V and VIII as to him is granted. Defendant Van Dorn's motion to dismiss certain counts as to him is granted with respect to Counts II, IV and VII, and denied with respect to Counts I, III, V, VI and VIII. Defendants' motion to strike and plaintiffs' motion for sanctions are denied.

SO ORDERED.

Dated:        New York, New York
              October 12, 2005

                                        _____
                                        GERARD E. LYNCH
                                        United States District Judge

---

[14] The Court further declines in its discretion to award fees to defendants in connection with the sanctions motion.